Filed 11/18/14  Certified for Publication (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JOSE A. DUARTE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CAIFORNIA STATE TEACHERS'<br>RETIREMENT SYSTEM et al.,<br><br>        Defendants and Respondents. | A135184<br><br>(Alameda County Super. Ct.<br>No. RG 09-490024) |

        Jose A. Duarte (Duarte) appeals from the trial court's denial of his petition for writ of administrative mandamus, through which he asserts that his application to the California State Teachers' Retirement System (CalSTRS) for disability retirement benefits has been improperly denied.  After hearing, an administrative law judge (ALJ) upheld CalSTRS's denial of Duarte's application for benefits, concluding that CalSTRS had no choice but to deny Duarte's application once he refused to complete the independent medical evaluation (IME) ordered by CalSTRS pursuant to section 24103, subdivision (b), of the Education Code.[1]  The trial court subsequently affirmed the decision of ALJ.  Duarte asserts on appeal that the trial court erred in concluding that he was ineligible for disability benefits under section 24101, subdivisions (a) and (c).  He additionally argues that the doctrine of collateral estoppel bars CalSTRS from relitigating the issue of his disability because several other state agencies have already found him to

---

[1] All statutory references are to the Education Code unless otherwise indicated.

1

be disabled. Because we conclude that Duarte cannot overcome his refusal to attend the IME ordered by CalSTRS in this case, we affirm.

## I. BACKGROUND

### A.  *Duarte's Employment and Disability History*

Duarte became a contributing member of the CalSTRS defined benefit program on September 1, 1993, when he began teaching in the Stockton Unified School District (SUSD). Duarte taught in Stockton through June 30, 1995, earning 2.023 years of creditable service for purposes of CalSTRS benefit calculations. Thereafter, the SUSD authorized unpaid personal leave for Duarte for the 1995-1996 school year and unpaid educational leave for each of the 1996-1997 and 1997-1998 school years. During his time away from teaching, Duarte spent one season working for the California Department of Forestry as a firefighter. In addition, he reportedly attended law school but, after failing to pass the bar, was working as a paralegal. On December 3, 2003, Duarte returned to teaching in the Oakland Unified School District (OUSD). On his second day of employment—December 4, 2003—he was assaulted by two students after he denied them entry into his classroom due to their disruptive behavior. Specifically, Duarte sustained an injury to his shoulder when one of the students knocked him backwards in order to get past him through the classroom door. According to Duarte, the other student threatened him several times, making statements such as "I'm gonna put a cap in your ass." As Duarte tried to complete the day's lesson, a number of students continued to mock him. Duarte has not returned to teaching since this incident.[2]

In January 2004, Duarte's treating psychologist, Dr. Sloman, opined that he was suffering from a post traumatic stress disorder (PTSD) and was "totally disabled with respect to working as a teacher." ~(CT 1811, 1492)~ Specifically, Dr. Sloman stated: "His anxiety, due to reminders of the original trauma, would be so high he could not

---

[2] Duarte did continue to work as a paralegal through January 2004. He gave conflicting reports as to whether he was laid off for economic reasons or because he was unable to concentrate due to the December 2003 altercation. In November 2004, Duarte attempted to work as a legal assistant for Fidelity National Title, but was reportedly fired after one month for making too many mistakes and/or not completing his assignments on time.

2

function." Dr. Sloman indicated in April 2005 that her original diagnosis had not changed. In March 2007, although she had last seen Duarte in November 2005, Dr. Sloman continued to diagnose him as suffering from PTSD and also reported that Duarte had difficulty focusing, impaired concentration when trying to complete what appear to be simple tasks, and an inability to understand and remember simple directions. She did not expect his condition to improve. Duarte's treating psychiatrist, Dr. Goldstein, stated in December 2004 that Duarte was suffering from significant intermittent depression and indicated that he had previously been diagnosed with this condition by a psychiatrist at Kaiser Hospital. In October 2005, after seeing Duarte for almost a year, Dr. Goldstein's stated diagnosis was PTSD with significant depression. He further indicated that, due to this condition, Duarte "has a definite lack of concentration, impaired energy, nightmares/flashbacks, memory loss, and anxiety." Moreover, "[d]ue to the daily stress and anxiety associated with this condition," Duarte was reported to be "unable to complete average daily tasks and is unable to make deadlines, appointments and other routine tasks required of him."

In March 2004, Duarte filed a worker's compensation claim with the Worker's Compensation Appeals Board in Oakland against the OUSD and the California Department of Education, which at the time managed and supervised the OUSD. During the processing of this claim, Duarte was evaluated by four different doctors. For instance, Dr. Matan—an orthopedic surgeon and qualified medical evaluator (QME)— concluded that Duarte has "disability precluding heavy or repetitive use of his left shoulder" and is "specifically precluded from doing significant work at or above shoulder height." According to Dr. Matan, Duarte is physically able to work as a teacher, but probably not as a firefighter. Another orthopedist and QME, Dr. Barber, confirmed "a level of permanent disability which precludes constant work at or above shoulder level on the left."

In addition, Duarte attended a psychiatric evaluation with psychiatrist Donald Stanford in December 2005. During that evaluation, Duarte indicated that he had been treated psychiatrically for stress for a short time in 1995 when he was working for the

3

SUSD. Records indicate that he was also treated for stress in 1998. Duarte additionally reported multiple learning problems involving reading that he has had throughout his life, along with issues related to short-term memory. Dr. Stanford concluded that Duarte's cognitive complaints appeared to be exaggerated and that reported problems with concentration and clear thinking were "not clinically evident." Further, he saw no new cognitive problems as a result of Duarte's OUSD injury. Dr. Stanford additionally opined that Duarte's PTSD symptoms had "resolved for the most part," although he would likely become anxious again if he were to resume his work as a teacher. In summary, Dr. Stanford concluded that Duarte had a period of "temporary psychiatric disability" as a result of the December 2003 incident, but that it had resolved by August 2004, other than a preclusion from returning to teaching. Other longstanding psychiatric and cognitive problems were unrelated to the OUSD injury.

Finally, Duarte received a psychiatric evaluation from Dr. Richard Lieberman in November 2005. Duarte reported longstanding issues with dyslexia and "short-term memory trouble with details and words" to Dr. Leiberman. Dr. Lieberman diagnosed Duarte with PTSD, resolving. He concluded that Duarte was psychiatrically totally and *temporarily* disabled from the date of the assault until the date of his evaluation. He recommended that Duarte not return to work as a "Spanish teacher for the Unified School District," but indicated that vocational rehabilitation would be appropriate. Ultimately, Duarte entered into a stipulated settlement of his worker's compensation claims on January 26, 2007. The executed settlement documents indicate a "serious dispute" regarding the scope of Duarte's disability.

In October 2006, Duarte applied for social security disability benefits. The California Department of Social Services (CalDSS) is charged with making disability determinations in California on behalf of the Social Security Administration (SSA), based on federal law. (See 42 U.S.C. § 421.) As part of this process, CalDSS sent Duarte to be examined by an orthopedist, Dr. Pon, and a psychologist, Dr. Felix. Dr. Pon concluded in March 2007 that Duarte should avoid reaching over the left shoulder level and should be limited to only occasionally climbing ladders, crawling, lifting 20 pounds, and reaching

4

using his left shoulder. Dr. Felix completed a psychological evaluation of Duarte that same month. Based on this evaluation, Dr. Felix concluded that Duarte "appears to be impaired in his ability to return to teaching." Specifically, Dr. Felix opined as follows: "[Duarte] would have difficulty in any situation involving the execution of even simple tasks in a consistent manner. He would be able to interact appropriately with co-workers, supervisors, and the public. It is possible that over time [Duarte] may overcome some of his slowness, terror, and emotional numbness."[3]

Ultimately, CalDSS determined on April 13, 2007, that Duarte was disabled from the date of the December 2003 incident. He became eligible for monthly disability benefits as of December 2005. According to Duarte, no hearing was ever held during this process, although he submitted a declaration to CalDSS and the SSA and was asked " 'Is that the truth and the whole truth?' " during one phone call from "one of the people from the Social Security Administration." Further, CalDSS did not issue a determination letter stating its reasons for approving his claim.

Duarte also had two student loans through the University of California (UC) totaling approximately $10,000 which he requested be forgiven due to his total and permanent disability. One loan was an institutional loan issued and funded by the UC, itself, while the other was a federally-funded loan issued under the federal Perkins Loan program. A representative of the UC testified at the administrative hearing in this matter regarding the process for loan forgiveness with respect to both student loans, stating that first the borrower "submits whatever medical documentation they would like" for consideration. Thereafter, the documentation is evaluated by medical staff at the relevant UC campus. "So, in the case of this U.C. Irvine loan that was evaluated by the medical staff at the Irvine campus, I'm not going to say that it's a comprehensive evaluation, but we do want to make at least a determination that the documentation appears, to our eyes,

---

[3] In making his determinations, however, it appears that Dr. Felix only considered the opinions of Duarte's treating doctors—Drs. Sloman and Goldstein. He does not appear to have been provided with the evaluations of Drs. Leiberman and Stanford. Further, Duarte, himself, testified that the SSA did not review any of his medical records outside of those relating to the December 2003 incident.

5

to be reasonable."  For the institutional loan, the recommendation of medical staff after this informal review is conclusive.  Indeed, there is no formal hearing, and no "formulated approach" or written standard to aid in a finding of disability.  With respect to the federal loan, once the UC makes a preliminary finding of disability, it releases its interest in the loan and forwards it to the U.S. Department of Education for a final determination based on federal standards.  After application of this stated process in the present case, Duarte's institutional loan was cancelled on the basis of total and permanent disability.  His federal loan was released by the UC and forwarded to the U.S. Department of Education on the basis of total and permanent disability.  The ALJ found that this federal loan was ultimately forgiven at the federal level "based on a standard that was not established at hearing."

B.      *Duarte's Application for CalSTRS Benefits*

On February 21, 2008, Duarte applied for disability retirement benefits through CalSTRS, claiming permanent and total disability as a result of the December 2003 incident.  Over the course of the next six months, CalSTRS repeatedly asked Duarte to submit various medical records and other documents necessary for consideration of his claim.  For instance, on June 3, 2008, CalSTRS indicated that—despite previous requests—it had not received all of the documentation necessary for its evaluation of Duarte's application.  It therefore requested, among other things, Duarte's worker compensation materials, including all reports of QMEs; the police report and principal report documenting the December 2003 attack; the remainder of an incomplete document previously submitted by Duarte; information regarding his CalDSS claim; and tax returns from 2004 to the present.  In response, Duarte supplied some of the materials requested.  On June 27, 2008, CalSTRS again requested documents, including the police report and principal report regarding the December 2003 incident, as the document previously submitted by Duarte as a police report appeared to be a Citizen Crime Report completed by Duarte, himself.  Again, Duarte partially complied.

On July 29, 2008, CalSTRS requested medical documents from 1992 through 2003; current employment information; tax returns for 2003; and information to clear up

6

an inconsistency in Duarte's employment history with OUSD after the attack. Finally, on August 5, 2008—indicating that it was trying to rule out a pre-existing disability based on certain statements made in the medical documentation Duarte had already submitted— CalSTRS again asked for his medical records from 1992 through 2003. Each of these CalSTRS letters indicated that Duarte's application was in danger of being rejected for failure to supply all of the requested materials within 45 days. (See § 24103, subd. (c).)[4]

On August 16, 2008, Duarte sent a letter to CalSTRS objecting to its process for handling his claim, arguing that he had complied with all of its previous requests, and indicating that he would submit his still outstanding Kaiser medical records only "**upon [CalSTRS's] commitment that it will pay my benefits if those records do not show a diagnosis of Post Traumatic Stress Disorder prior to December 4, 2003.**" Duarte further stated that "[i]f [CalSTRS] does not commit to that position, I will conclude that [CalSTRS] does not need those records for any legitimate purpose, and that I am in complete compliance with [CalSTRS] and eligible for benefits."

By letter dated September 8, 2008, CalSTRS indicated to Duarte that it was still waiting for additional records from him and that it could not commit to approve his application "in advance of having all of the necessary information and documentation to support a final decision." Under such circumstances, CalSTRS informed Duarte that it was exercising its right, under section 24103, subdivision (b), to order him to attend IMEs prior to a final determination of his disability claim. The scheduling of the IMEs was handled by Benchmark Medical Consultants (Benchmark), and Duarte initially indicated enthusiasm for completing the evaluations as soon as possible. Eventually, IMEs were scheduled with a neuropsychiatrist for October 2008, an orthopedic surgeon for November 2008, and a neuropsychologist for December 2008. Duarte did attend his

---

[4] Section 24103, subdivision (c), provides in relevant part that CalSTRS "may reject the disability retirement application under this part if the member fails to provide requested medical documentation to substantiate a disability, as defined in Section 22126, within 45 days from the date of the request . . . ."

first IME as scheduled.  Thereafter, however, he declined to participate in his two remaining IMEs.

In fact, on September 10, 2008—two days after CalSTRS sent Duarte its request for IMEs in this matter—Duarte had filed a lawsuit in superior court, seeking various forms of mandamus, injunctive, and declaratory relief and alleging an assortment of constitutional violations.  In essence, Duarte sought an order compelling the State of California to pay him disability benefits.  (*Duarte v. State of California* (Super. Ct. Alameda County, 2008, No. RG08408741).)  CalSTRS filed a demurrer on October 10, 2008, arguing, among other things, that CalSTRS had not yet rendered a decision with respect to Duarte's disability claim and that Duarte had failed to exhaust his administrative remedies.  On November 6, 2008, the trial court granted the demurrer with leave to amend, noting that Duarte had failed to exhaust his administrative claims and that the "viability of any constitutional claims appears to be contingent upon completion of the administrative process . . . ."  Rather than amend his pleadings, Duarte reports that he voluntarily dismissed the litigation based on CalSTRS representations that "he had the right to appeal any CalSTRS decision at any level."

The next day, November 7, 2008, Duarte sent a letter to CalSTRS requesting a hearing on a laundry list of "decisions" that CalSTRS had made in the course of processing his application for benefits, including CalSTRS's "incorrect" decisions that his PTSD was due to a pre-existing condition, that prior disability determinations of other California agencies are not binding on CalSTRS, and that he should attend IMEs.  On November 11, 2008, Duarte also sent a letter to Benchmark stating that he had "appealed" his application for CalSTRS disability benefits, that all matters were "stayed," and that there would be "no IMEs" until the issues were resolved by an administrative law judge.  Finally, on November 14, 2008, Duarte reiterated his request for a hearing to CalSTRS, stating:  "Basically, I want some authority figure or officer to decide whether a determination of disability by [the California Employment Development Department], CalDSS, and SSA should not bind CalSTRS because if it does, there will be no need for

any more IMEs. However, if a hearing officer determines otherwise, I will certainly cooperate with any reasonable CalSTRS request, including IMEs."

By letter dated November 21, 2008, CalSTRS informed Duarte that the disability decisions of other agencies are not binding on CalSTRS because "the California Education Code has its own definition of disability along with eligibility and timeliness of application requirements." After noting that it had the statutory authority to order IMEs pursuant to subdivision (b) of section 24103, CalSTRS stressed the need for Duarte to reschedule his two remaining IMEs and noted that failure to do so would "cause CalSTRS to take further action." In response to this letter, Duarte sent a note dated December 2, 2008, to Benchmark indicating that he had been told by a CalSTRS attorney that an ALJ decision might happen by July 2009. The note further stated: "Perhaps IMEs in August 2009 if ordered by an ALJ." On December 5, 2008, Duarte threatened CalSTRS with further litigation unless he received a hearing as requested. Thereafter, on December 23, 2008, CalSTRS denied Duarte's application for disability retirement benefits due to his failure to reschedule his IME appointments. In response, Duarte requested an immediate ALJ hearing.

Since Duarte disagreed with CalSTRS's rejection of his application, the agency forwarded his case to the Executive Review Committee (ERC) in accordance with its usual procedures. On January 27, 2009, the ERC upheld the denial of Duarte's application for benefits. According to the ERC, CalSTRS requested IMEs pursuant to section 24103, subdivision (b), in order to ascertain whether Duarte had been continuously incapacitated from performance of service since December 2003 and whether he met the CalSTRS definition of disability. The ERC concluded that CalSTRS was "statutorily precluded" from approving Duarte's application for disability benefits because he refused to attend the necessary IMEs. It further indicated that there was no legal basis for approving Duarte's application for disability retirement benefits based on the disability determinations of other agencies. Because Duarte had already formally requested an ALJ hearing, CalSTRS indicated that it would be proceeding directly to hearing in the matter.

9

**C.** *The Administrative Hearing*

After a number of continuances and voluminous motions and other filings, Duarte's appeal was finally heard by the ALJ on January 12 and 13, 2010. Representatives of CalSTRS (De Fonte) and Benchmark (Cotten) testified at the hearing regarding the application process for CalSTRS disability retirement benefits and the IME process, both generally and in this case. With respect to CalSTRS's decision to request that Duarte attend IMEs, De Fonte testified: "We were never certain we had all the records because what would happen would be, new records would come up at different times for Mr. Duarte. [¶] Even in the course of one independent medical evaluation that he went to, he brought a set of records that he never provided to us. That we had requested any and all records, new records came up all the time. De Fonte further testified: "[W]e got records that supported one picture. We didn't get all of the records. We might get, first, a deposition where we'd only receive certain pages of the deposition, not the full deposition. We didn't ever get the full picture of things." Thus, the decision was made "to have our own evaluation done to determine to, kind of, get to the bottom of the line—to get to the bottom answer." De Fonte also noted that Duarte's case review was complicated by the fact that it involved a "very specific law" which required not just that Duarte be disabled, but also that his disability "be a direct result of an unlawful act." Finally, since CalSTRS law required that a member be "continuously incapacitated" and Duarte had applied for benefits five years after his injury, "[i]t was important to have a clear picture of what his condition is today, as well as the years in between."[5] With respect to the actual scheduling of the IMEs, Cotten testified for Benchmark that her impression from her communications with Duarte was that he was unwilling to proceed with the remaining IMEs until after an ALJ decision in the matter.

Duarte, for his part, argued that the prior disability determinations by other state agencies should be controlling, that CalSTRS's interpretation of section 24103, subdivision (b), constituted an impermissible "underground regulation" in violation of the

---

[5] In fact, CalSTRS highlighted all of these concerns in its letter of October 14, 2008, to Benchmark setting the scope for Duarte's IMEs.

Administrative Procedures Act, and that he never indicated that he would not attend the IMEs. In addition, as stated above, a representative from the UC testified regarding the process for forgiving Duarte's two student loans based on his claim of disability. Duarte, himself, testified regarding the medical evaluations and treatment that he had participated in since the December 2003 incident.

On April 14, 2010, the ALJ issued a proposed decision upholding CalSTRS's denial of Duarte's application for disability benefits. Specifically, the ALJ found that CalSTRS does not accept disability findings by other agencies as controlling and that neither CalDSS nor the UC has a special relationship with CalSTRS, other than each being a governmental agency. With respect to the IMEs ordered in this case pursuant to section 24103, subdivision (b), the ALJ found "no ambiguity" in the language of that statute "which empowers CalSTRS to conduct its own IME examinations, and compels CalSTRS to deny an application for disability benefits when the applicant has refused to submit to such an examination." Indeed, according to the ALJ, "the Legislature has made compliance with a request to submit [to an IME] by CalSTRS part of the applicant's obligation to provide medical documentation to support a claim of disability." Under the present circumstances, the ALJ concluded that Duarte refused to submit to an IME "for various reasons, none of which excuse his failure to submit." Thus, CalSTRS had "no choice" but to deny Duarte's application.

With respect to the question of the collateral estoppel effect to be given to the disability determinations of other administrative agencies, the ALJ determined that such an inquiry is relevant only to "the factual question of [Duarte's] disability." Since the issue of Duarte's disability was never determined by CalSTRS due to Duarte's refusal to complete his IMEs, the ALJ did not reach the collateral estoppel issue. However, the ALJ did conclude that using the disability findings of other administrative agencies to somehow "exempt" Duarte from the obligation of submitting to an IME ordered pursuant to section 24103, subdivision (b), would "directly contravene[]" the plain language of that statute.

Subsequently, on June 2, 2010, the Appeals Committee of the Teacher's Retirement Board (CalSTRS Board) adopted the ALJ's proposed decision as its own, with minor nonsubstantive amendments. The minutes of the Appeals Committee meeting indicate that the "committee requested staff encourage Mr. Duarte to reapply and submit the necessary documentation."[6]

## D. *The Petition for Writ of Mandate*

On December 18, 2009—less than a month *before* the scheduled administrative hearing in this matter—Duarte had filed a second petition for writ of mandate in Alameda County Superior Court, seeking to compel CalSTRS to award him disability benefits and advancing many of the same arguments presented to the ALJ, as well as numerous other constitutional, contractual, and equitable claims. On December 21, 2009, Duarte requested that the trial court stay the administrative proceedings, but no action was taken by the court and thus, as described above, the ALJ hearing went forward as scheduled on January 12 and 13, 2010. Duarte filed a supplement to his writ petition on January 7, 2011, which detailed his many claims of error with respect to the ALJ decision ultimately adopted by CalSTRS. Thereafter, in September 2011, the parties stipulated to the contents of the administrative record. And, on September 13, 2011, Duarte, through new counsel, filed his Amended Petition for Peremptory Writ of Administrative Mandamus (Writ Petition), the operative pleading in these proceedings. ~(CT 2525-2553)~

---

[6] With respect to the June 2, 2010, minutes of the Appeals Committee, we have considered CalSTRS's judicial notice request and the opposition thereto. The request for judicial notice is hereby granted. The minutes are an official act of a state agency and lend further support to uncontradicted evidence already in the record. (Evid. Code, §§ 452, subd. (c) & 459; *Fowler v. Howell* (1996) 42 Cal.App.4th 1746, 1750.) We may take judicial notice of the minutes, even though notice thereof was not taken by the trial court. (*Taliaferro v. County of Contra Costa* (1960) 182 Cal.App.2d 587, 592.) In this regard, we note that, although not judicially noticed by the trial court, the minutes (with appropriate citation to their location on the CalSTRS website) were brought to the trial court's attention in CalSTRS's Opposition to Motion for Writ of Administrative Mandate. The trial court found that the record supports the conclusion that CalSTRS followed its established process when handling Duarte's appeal and that the final decision in this matter was "made or approved by the CalSTRS Board." We find no fault with this conclusion.

12

After briefing and argument, the trial court issued its Judgment and Statement of Decision on February 15, 2012, denying Duarte's Writ Petition. Specifically, the trial judge held that the weight of the evidence supports the conclusion that CalSTRS properly rejected Duarte's application for disability retirement because he failed to appear for the IMEs ordered pursuant to subdivision (b) of section 24103. The trial court also determined that Duarte did not qualify for disability benefits under section 24101, subdivision (a)—which requires at least five years of service credit—because his three years of leave from SUSD did not count as creditable service. With respect to the issue of collateral estoppel, the court found that CDSS and the UC are not in privity with CalSTRS regarding their respective disability determinations and that the standards for disability among the three agencies differ. On this basis, the trial court concluded that the prior disability determinations of CDSS and the UC "do not act through collateral estoppel to preclude CalSTRS from making an independent disability determination" under the facts of this case. The trial court finally held that the weight of the evidence supported the conclusion that Duarte received a fair hearing and that CalSTRS followed appropriate procedures in reaching its final determination on Duarte's application.

Duarte filed a motion for a new trial on March 12, 2012, challenging the court's conclusion that his three years of SUSD leave did not count as years of creditable service for purposes of eligibility under section 24101, subdivision (a). In addition, Duarte claimed that his failure to attend IMEs was a separate issue from his eligibility under section 24101, subdivision (c), and that the court should have found him eligible under that statute. On April 16, 2012, the trial court denied Duarte's motion. Duarte filed his notice of appeal the next day.

## II. DISCUSSION

### A. *Standard of Review*

Judicial review of the denial of CalSTRS disability benefits is governed by the administrative mandate process set forth in section 1094.5 of the Code of Civil

Procedure.[7]  (*See Welch v. State Teachers' Retirement System* (2012) 203 Cal.App.4th 1, 15-16 (*Welch*).)  When a mandamus proceeding challenges an administrative decision affecting a fundamental vested right (such as the right to disability retirement benefits at issue here), the trial court must independently review the agency's findings to determine if they are supported by the weight of the evidence.  (*Welch*, *supra*, 203 Cal.App.4th at p. 16; see also Code Civ. Proc., section 1094.5, subd. (c) ["in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence"].)  In doing so, however, the court " 'must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' "  (*LaGrone v. City of Oakland*  (2011) 202 Cal.App.4th 932, 940 (*LaGrone*).)

On appeal from a decision of a trial court applying its independent judgment, we review the trial court's findings rather than those of the administrative agency.  (*Calderon v. Anderson* (1996) 45 Cal.App.4th 607, 612 (*Calderon*).)  Specifically, we review the trial court's factual findings for substantial evidence.  In doing so, we must resolve all conflicts in favor of CalSTRS, the party prevailing below.  Further, we cannot reweigh the evidence.  Thus, we do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually made by the trial court.  (*Natalie D. v. State Dept. of Health Care Services* (2013) 217 Cal.App.4th 1449, 1455; see also *LaGrone, supra,* 202 Cal.App.4th at p. 940.)  In sum, "[t]he question on appeal is whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion that the weight

---

[7] Pursuant to subdivision (b) of section 1094.5 of the Code of Civil Procedure, "[t]he inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.  Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

of the evidence supports the [agency's] findings of fact. [Citation.] We uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable." (*Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1078 (*Breslin*).)

With respect to issues of law, in contrast, our review is de novo. (*Breslin, supra,* 146 Cal.App.4th at p. 1077.) In this regard, we acknowledge that CalSTRS's interpretation of its governing statutes is entitled to "great weight and deference." (See *Calderon*, *supra*, 45 Cal.App.4th at pp. 612-613.) Nevertheless, "[s]tatutory interpretation is a clear question of law for our determination anew on appeal." (*Breslin, supra,* 146 Cal.App.4th at p. 1077.)

**B.** ***Statutory Scheme Governing CalSTRS Disability Retirement Benefits***

CalSTRS was created by the Legislature in 1913 as a retirement system for credentialed California teachers and administrators in kindergarten through community college. (See § 22000 *et seq*. [Teachers' Retirement Law]) ~(CT 2564)~ The CalSTRS Board is responsible for the administration of CalSTRS, including implementation of the State Teachers' Retirement Plan (plan), and "shall set policy and shall have the sole power and authority to hear and determine all facts pertaining to application for benefits under the plan or any matters pertaining to administration of the plan or [CalSTRS]." (§ 22201, subd. (a); see §§ 22200, 22219, subd. (a); see also § 22208 [CalSTRS Board may delegate powers to a committee].) The CalSTRS Board has fiduciary obligations— both statutory and constitutional—to soundly administer the plan and maintain its fiscal integrity. (See § 22250 [providing that CalSTRS Board must discharge its duties under the Teachers' Retirement Law "solely in the interest of the members and beneficiaries" and for the "exclusive purpose" of providing benefits and defraying administrative expenses]; see also Cal. Const., art. XVI, § 17, and subd. (b) ["[n]otwithstanding any other provisions of law," a retirement board for a public pension or retirement system must discharge its duties "solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system"].)

15

The constitutional obligations of a public retirement board such as the CalSTRS Board have been interpreted to include a duty "to 'ensure the rights of members and retirees to their full, *earned* benefits.' " (*City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 544, italics added.) Such obligations therefore do not permit the payment of benefits not otherwise authorized. (*Ibid.*) Rather, "the statutory scheme governs the scope of the benefits earned." (*Chaidez v. Board of Administration* (2014) 223 Cal.App.4th 1425, 1430-1431.) Thus, while " '[p]ension provisions should be broadly construed in favor of those who were intended to be benefited thereby . . . [,] they cannot be construed so as to confer benefits on persons not entitled thereto.' " (*Id.* at p. 1431.) With this in mind, we consider the statutes governing Duarte's claim for disability benefits in this case.

For purposes of the CalSTRS disability retirement program, "disability" is defined as "any medically determinable physical or mental impairment that is permanent or that can be expected to last continuously for at least 12 months, measured from the onset of the disability, but no earlier than the day following the last day of actual performance of service that prevents a member from performing the member's usual duties for the member's employer, the member's usual duties for the member's employer with reasonable modifications, or the duties of a comparable level position for which the member is qualified or can become qualified within a reasonable period of time by education, training, or experience." (§ 22126.)[8] Essentially, a person is disabled under this statutory definition "if the person is unable to perform his or her regular duties or comparable duties [with] reasonable accommodation and that inability is permanent or expected to last at least a year from the date of onset." (*Welch*, *supra*, 203 Cal.App.4th at p. 11.)

---

[8] Unless otherwise indicated, we reference the current versions of the CalSTRS statutes in this opinion. To the extent the statutes have been amended since the December 2003 incident which prompted Duarte's application for benefits, we have determined that any such amendments do not substantively affect his claims.

The Teachers' Retirement Law, however, contains additional eligibility requirements for obtaining disability retirement benefits. Generally speaking, for example, a member may only apply for disability retirement if that member has five or more years of credited service and meets a number of listed criteria. (§ 24101, subd. (a).) Most relevant to the present case are the requirements: (1) that at least four years of service were credited for actual service performed (including certain periods where the member was receiving workers' compensation); (2) that the last five years of credited service were performed in California; and (3) that the application is not based on a pre-existing condition. (§ 24101, subd. (a)(1), (2) & (6).)

The requirement that an eligible member must have performed at least four years of actual service is relaxed if such lack of actual service "is due to an on-the-job injury or disease" while engaged in CalSTRS-covered employment. (§ 24101, subd. (b).) Under such circumstances, a member may take advantage of additional credit purchased under the Teachers' Retirement Law for certain specified activities, including military service, teaching in the Peace Corps, and (as is relevant here) "[t]ime spent on a sabbatical leave, approved by an employer in this state after meeting the requirements of Section 44969." (§§ 22803, subd. (a)(6) & (7), 22851.) Currently, in order for sabbatical leave to be creditable, a member must have previously rendered seven years of consecutive service and have agreed in writing to provide a period of service equal to twice the period of the leave upon return from the leave. (§§44967, 44969.)[9]

---

[9] Section 22803, subdivision (a)(7), regarding the requirements for creditable sabbatical leave, has been amended since Duarte took his one year of unpaid personal leave (1995-1996) and two years of unpaid education leave (1996-1997 and 1997-1998). (See Stats. 2009, ch. 304, § 8 (SB 634).) The trial court concluded that Duarte's three years of leave did not constitute sabbatical leave under section 22803, subdivision (a)(7)—and therefore were not possible creditable years of service—because Duarte did not meet the requirements of the current version of the statute. Duarte argues on appeal that his right to credit for his three years of leave should be judged under the version of the statute in effect during the years he actually took the leave. CalSTRS counters that the statutory change is irrelevant given the trial court's finding that "there is 'no indication in the record that [Duarte] ever applied to purchase service credit for his sabbatical years or actually made any purchases of service credit.'" We need not resolve this conflict,

17

Further, a member that meets the special eligibility requirements of subdivision (c) of section 24101, is required to have only one year of credited service, a requirement clearly met by Duarte in this case.  (§ 24101, subd. (c)(1).)  Specifically, subdivision (c) provides:   "Nothing in subdivision (a) shall affect the right of a member under this part who has less than five years of credited service to a disability retirement allowance if the following conditions are met: [¶]  (1) The member has at least one year of credited service performed in this state.  [¶]  (2) The disability is a direct result of an unlawful act of bodily injury that was perpetrated on his or her person by another human being while the member was performing his or her official duties in a position subject to coverage under the Defined Benefit Program.  [¶]  (3) The member provides documentation of the unlawful act in the form of an official police report or official employer incident report."  (§ 24101, subd. (c).)

Even if otherwise eligible for disability benefits, however, a member must also meet the application timing requirements set forth in section 24102.  As is relevant here, that section provides as follows:  "(a) The board may authorize payment of a disability retirement allowance under this part to any member who is qualified upon application by the member, the member's guardian or conservator, or the member's employer, *if the application is submitted* on a properly executed form prescribed by the system *during any one of the following periods*: [¶] (1) While the member is employed and has performed creditable service within the four months previous to application, or while the `member` is on a compensated leave of absence. [¶] (2) While the member is physically or mentally incapacitated for performance of service and the incapacity has been continuous from the last day of actual performance of service for which compensation is payable to the member. [¶] . . . [¶] (4) Within four months after the termination of the member's employment subject to coverage under the Defined Benefit Program, if the application was not made under paragraph (2) and was not made more than four months after the last day of actual performance of service for which compensation is payable to the member."

however, as we do not reach the issue of Duarte's eligibility for disability benefits under section 24101, subdivision (a).

18

(§ 24102, italics added.)  In addition, subdivision (b) of section 24102 reiterates that a "member is not qualified to receive a disability retirement allowance if the member is applying because of a physical or mental condition that existed at the time the most recent membership in the Defined Benefit Program commenced and which remains substantially unchanged at the time of application."  Thus, in order to meet the requirements of section 24102, Duarte would need to establish both that his disability was not attributable to a pre-existing condition and that he was continuously disabled from the December 2003 incident until the February 2008 filing of his application for benefits.

Finally, in order to establish eligibility to the satisfaction of CalSTRS, an applicant for disability benefits must comply with the documentation requirements set forth in sections 22450 and 24103.  Pursuant to section 22450 subdivision (a), "[e]ach member and beneficiary shall furnish to the board any information affecting his or her status as a member or beneficiary of the Defined Benefit Program as the board requires, which may include, but shall not be limited to, the following: [¶]  (1) Financial statements, certified copies of state and federal income tax records, or evidence of financial status.  [¶] (2) Employment, legal, or medical documentation."  Additionally, section 24103 provides in relevant part as follows:  "(a) The member shall provide medical documentation substantiating the impairment qualifying the member for the disability retirement under this part. [¶]  (b) On receipt of an application for disability retirement under this part, *the system may order a medical examination* or review of medical documentation of a member to determine whether the member is incapacitated for performance of service. The medical examination or review of medical documentation shall be conducted by a practicing physician, selected by the board, with expertise in the member's impairment, and the board shall pay all costs associated with the examination or review of medical documentation.  *If the member refuses to submit to the required medical examination* or review of medical documentation, *the application for disability retirement shall be rejected.* . . . [¶]. . . [¶] (c) The system may reject the disability retirement application under this part if the member fails to provide requested medical documentation to substantiate a disability, as defined in Section 22126, within 45

19

days from the date of the request or within 30 days from the time that a legally designated representative is empowered to act on behalf of a member who is mentally or physically incapacitated." (§ 24103, subd. (a), (b) & (c), italics added.) Thus, based on the plain language of section 24103, CalSTRS has broad discretion to order an IME in a particular case, but no choice other than to reject an application if a member refuses to submit to an IME request from CalSTRS.

**C.** *Failure to Complete Section 24103(b) Medical Examinations*

In this case, as detailed above, CalSTRS requested that Duarte submit to IMEs pursuant to section 24103, subdivision (b), on September 8, 2008. Specifically, Duarte was ordered to attend three IMEs, one with an orthopedic surgeon, one with a neuropsychiatrist, and one with a neuropsychologist. The trial court concluded that "[t]he weight of the evidence supports the conclusion that CalSTRS acted within its discretion by ordering [Duarte] to take medical examinations." We agree.

First, the record supports the conclusion that, despite repeated requests, CalSTRS had not received all of the documentation that it had requested from Duarte and that some of the documents submitted were incomplete. Further, the documentation that was provided raised issues regarding the scope of Duarte's disability and the possibility of cognitive and/or psychological deficits which pre-dated the December 2003 incident. Finally, because Duarte filed his application for disability benefits many years after the termination of his CalSTRS-covered employment, his application was only timely under section 24102, subdivision (a)(2), if he could prove that he was continuously incapacitated from his last day of service (December 4, 2003) until his application filing date (February 21, 2008). Thus, it was important to have a clear picture of Duarte's condition in February 2008, almost a year after his last evaluation. Given the broad discretion afforded to CalSTRS when evaluating applications for disability benefits, these facts were certainly sufficient to support CalSTRS's decision to seek its own medical evaluations to—as the CalSTRS's representative put it— "get to the bottom answer" in this case.

The trial court further concluded that "[t]he weight of the evidence supports the conclusion that CalSTRS properly rejected [Duarte's] application for disability retirement because he failed to appear for the medical examinations." Again, we agree. Although, admittedly, Duarte did not state that he would *never* attend further IMEs, he failed to attend the last two IMEs scheduled and indicated a willingness to reschedule only if ordered to do so at some point in the future by the ALJ. Since Duarte was entitled to administrative review of his case only after CalSTRS had actually acted upon his application, Duarte's position was tantamount to a refusal to supply the information necessary for CalSTRS to make a reasoned disability determination. Under such circumstances, the plain language of section 24103, subdivision (b), mandated that CalSTRS reject his claim.[10]

Duarte's repeated reliance on the doctrine of collateral estoppel to justify his actions does not change this analysis or our conclusions. Specifically, Duarte asserts that the issue of his disability had already been conclusively determined in prior administrative proceedings before CalDSS and the UC. Thus, he argues, CalSTRS should have deemed Duarte's disability a "settled issue under the doctrine of collateral estoppel and approved his application for disability retirement."[11] However, as the ALJ properly found in this case, CalSTRS *never even reached* the issue of Duarte's disability. Rather, his application was rejected on procedural grounds. Thus, there was simply no need to consider any possible preclusive effect of these prior disability determinations in the context of this case.

Moreover, to the extent Duarte is contending that notions of collateral estoppel provide him with some kind of exemption from the statutorily-mandated process for the award of CalSTRS disability benefits, we believe his argument misapprehends the nature

---

[10] Because we conclude that CalSTRS's denial of benefits was supportable on this ground, we do not consider whether Duarte otherwise meets the eligibility requirements of section 24101.

[11] Whether collateral estoppel applies in a particular case is a question of law which we review de novo. (See *Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 618.)

and scope of the doctrine. At its most fundamental, "[i]ssue preclusion, or collateral estoppel, ' "precludes *relitigation* of issues argued and decided in prior proceedings." ' " (*City of Oakland v. Oakland Police & Fire Retirement System* (2014) 224 Cal.App.4th 210, 227-228, italics added.) Thus, until there has actually been a determination made that is adverse to an issue previously litigated, and that determination is challenged in a second adversarial proceeding, a collateral estoppel argument is simply inapposite. Rather, what is pertinent during CalSTRS's decision making phase is the agency's fiduciary duty to all of its members to soundly administer the plan and maintain its fiscal integrity. ~(CT 2564)~ (See § 22250; see also Cal. Const., art. XVI, § 17, subd. (b).) By helping to ensure that only earned benefits are paid, CalSTRS's statutorily prescribed application process is an essential tool, assisting CalSTRS in fulfilling this fiduciary obligation.

Undoubtedly, the prior disability determinations of other state agencies—and the medical documentation on which they were based—are highly relevant in the context of Duarte's application for CalSTRS benefits. Presumably, this is why CalSTRS has been given such broad powers to collect and consider these materials. (See §§ 22450, 24103.) However, until CalSTRS can analyze all of the relevant evidence in the context of its own statutory framework, make its own disability determination, and articulate the reasons for its position, the actual significance of any prior disability determinations to Duarte's application is impossible to discern. CalSTRS, for instance, might go through its process; conclude that Duarte meets its disability, eligibility, and timeliness requirements; and award him benefits. Under such circumstances, the possible preclusive effect of prior disability determinations would obviously be irrelevant. Or, CalSTRS could conclude that Duarte was not continuously incapacitated from the December 2003 incident to the date he filed his application for benefits in February 2008, and thus his application was untimely. (See § 24102, subd. (a)(2).) Since this particular issue was not considered by either CalDSS or the UC in making their disability determinations, it would be difficult to advance a collateral estoppel argument in this situation. Finally, CalSTRS could find that Duarte is not disabled under the CalSTRS definition because, while unable to return to

22

teaching, he could perform the duties of a comparable non-teaching position. (§ 22126.) In this instance, the preclusive effect of prior disability findings might possibly be argued in subsequent litigation contesting the CalSTRS decision. [12]

In sum, under each of these scenarios, the collateral estoppel argument would differ depending upon the determination made. In its hearing on Duarte's Writ Petition, the trial court recognized as much, stating: "Let's say a new application was put in and the examination was done would not the court be in a better position to determine whether or not this was an appropriate case to apply the doctrine of collateral estoppel than it would be if it did not have the report of the physician? . . . [¶] . . . [M]y question is would the court not be in a better position to determine whether or not, let's say in the case of an adverse finding by the physician, depending on what the physician said, would not the court be in a better position to determine whether or not, not withstanding a physician's finding, the state was not free to relitigate that issue[?]" The answer to the trial court's inquiry is that, not only would the court be in a *better* position, it would be in the *only* position where consideration of a collateral estoppel argument would be

---

[12] While we do not decide the issue, we note that—even under these hypothetical circumstances—Duarte would appear to be facing an uphill battle with his collateral estoppel claim. Given the informal nature of the prior disability determinations made by CalDSS and the UC, for instance, it would seem difficult to assert that these "prior proceedings" possessed a "judicial character" sufficient for the invocation of the doctrine. (See *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 944; *Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 878-879.) Moreover, the mere fact that CalDSS, CalSTRS and the UC are all state agencies may very well be insufficient to establish privity, a required element of collateral estoppel. (See *People v. Garcia* (2006) 39 Cal.4th 1070, 1078-1079, 1080, 1083 [reaffirming prior precedent which found privity between governmental agencies where there is an integrated relationship, sharing of information, and joint operation based on mutual goals]; see also *Hudson v. Board of Administration* (1997) 59 Cal.App.4th 1310, 1330 [" '[t]he acts of one public agency will bind another public agency only when there is privity, or *an identity of interests* between the agencies,' " italics added].)

appropriate—in a second adversarial proceeding challenging an actual conflicting determination.

The record in this case makes clear that Duarte is free to file a new application with CalSTRS at any time, submit to the agency's process, and receive a determination of the merits of his disability claim. If he does so, if that decision denies him benefits, and if he appeals the agency's conclusion, his collateral estoppel argument may finally be ripe for consideration. As of this date, however, we see no error in the trial court's determination.

## III.  DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

**CALIFORNIA COURT OF APPEAL
FIRST APPELLATE DISTRICT
DIVISION FOUR**

JOSE A. DUARTE,
    Plaintiff and Appellant,
    v.
CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM et al.,
    Defendants and Respondents.

A135184
Alameda County
Sup. Ct. No. RG09490024

BY THE COURT:

The request for publication of this court's November 18, 2014 opinion is granted.

The Reporter of Decisions is directed to publish said opinion in the Official Reports.

(Ruvolo, P. J., Reardon, J., and Rivera, J. joined in the decision.)

Date:____Dec 15, 2014_____    _____Ruvolo_____P. J.

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Hon. Evelio Grillo |
| Counsel for Plaintiff and Appellant: | Law Offices of Jivaka Candappa<br>Jivaka Candappa |
| Counsel for Defendants and Respondents: | Attorney General of Californa<br>Kamala D. Harris<br>Senior Assistant Attorney General<br>Julie Weng-Gutierrez<br>Supervising Deputy Attorney General<br>Karin S. Schwartz<br>Deputy Attorney General<br>Charles J. Antonen |

*Duarte v. California State Teachers et al.* A135184