Filed 7/14/23 Wilcox v. California State Teachers Retirement System CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| COLLEEN WILCOX, | H049809 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 20CV364700) |
| v. | |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM, | |
| Defendant and Respondent. | |

## I.    INTRODUCTION

Colleen Wilcox was employed for 14 years as the Superintendent of the Santa Clara County Office of Education (SCCOE) and was a member of the California State Teachers' Retirement System (CalSTRS). Under the Teachers' Retirement Law (Education Code section 22000 et seq.),[1] CalSTRS " 'is the state agency responsible for managing contributions made by employees and member school districts to the State Teachers' Retirement Fund. [Citation.]' " (*Blaser v. State Teachers' Retirement System* (2019) 37 Cal.App.5th 349, 356.) After Wilcox left the employ of SCCOE in 2008 and retired in 2010, a dispute arose with CalSTRS concerning the characterization of her compensation as it affected the calculation of her monthly retirement benefits. In May 2016, CalSTRS advised Wilcox that $20,000 that she had directed over a three-year

---

[1] All further statutory references are to the Education Code unless otherwise specified.

period to be transferred from her deferred compensation fund to additional salary did not qualify as creditable compensation in determining her retirement benefits. CalSTRS also told Wilcox that the entire amount of compensation she had received from November 1, 2007 through June 30, 2008 ($188,000) under a settlement agreement was improperly reported by her employer, SCCOE, as creditable. Wilcox challenged those conclusions. After an administrative hearing, an Administrative Law Judge (ALJ) upheld CalSTRS's conclusions that the additional salary taken over a three-year period and the compensation paid under the settlement agreement were improperly reported by SCCOE, as creditable, thereby overstating Wilcox's retirement benefits. The decision was adopted (with minor revisions) by CalSTRS's Appeals Committee (Appeals Committee) on February 3, 2019 (the Administrative Decision).

Wilcox challenged the Administrative Decision by filing a petition for writ of mandamus with the superior court. In an order filed January 11, 2021, the court upheld the Administrative Decision, with one exception. The court held, contrary to the ALJ, that the overpayment claims asserted by CalSTRS against Wilcox were barred, in part, by the applicable three-year statute of limitations. Judgment was entered on September 1, 2021.

Wilcox argues on appeal that the trial court erred in upholding the Administrative Decision. She contends that the plain language of her employment contract permitted her to designate as additional salary sums that she was otherwise entitled to receive as deferred compensation and that, after she so designated them as salary, the amounts were properly creditable for purposes of calculating retirement benefits. Wilcox argues further that she continued to be employed by the SCCOE (albeit no longer as Superintendent) from November 1, 2007 through June 30, 2008, and the income she received as specified in the settlement agreement was salary that was creditable under the Education Code. Lastly, Wilcox challenges the rejection by the ALJ (and by the trial court) of her contention that because CalSTRS unreasonably delayed in asserting that this income was

2

improperly reported as creditable, it is barred from doing so under the equitable doctrine of laches.

We conclude that there was no error and will therefore affirm the judgment.

## II. FACTUAL AND PROCEDURAL HISTORY

### A. Wilcox's Employment with SCCOE

#### 1. *Employment Contracts and Deferred Compensation*

On November 10, 2003, Wilcox and the Board of Education of the County of Santa Clara (SCCOE Board) entered into a contract entitled "<u>MEMORANDUM OF UNDERSTANDING</u>" under which she would be employed as Superintendent for the period of July 1, 2003 to June 30, 2007 (Employment Contract). It provided that she would receive "<u>Salary</u>" in the annual amount of $192,328. The Employment Contract included a separate provision (under the subheading "<u>Benefits</u>") under which the SCCOE Board would pay Wilcox each year $20,050 "into a deferred compensation fund . . . or as additional wages as designated and directed by the County Superintendent." The amounts designated in the Employment Contract for annual salary and for the deferred compensation fund were changed in two later written contracts.

On May 17, 2005, Wilcox elected in writing to accept $5,000 as part of her "annual salary" from the total amount of $20,050 of her deferred compensation for the 2005-2006 school year, thereby leaving $15,050 as deferred compensation. The SCCOE acknowledged this designation in a memorandum to Wilcox noting an "[i]ncrease to base" in salary by $5,000.

The next year, on May 23, 2006, Wilcox elected in writing to accept $7,500 as "annual salary" from the then-specified total amount of $20,000 of her deferred compensation for the 2006-2007 school year, thereby leaving $12,500 as deferred compensation. The SCCOE acknowledged this designation in a memorandum to Wilcox noting as an addition under her base salary a "[t]ransfer from [a]nnuity" of $7,500.

3

On or about May 3, 2007, Wilcox elected in writing to accept $7,500 as "annual salary" from the then-specified total amount of $12,500 of her deferred compensation for the 2007-2008 school year, thereby leaving $5,000 as deferred compensation. The SCCOE acknowledged this designation in a memorandum to Wilcox noting as an addition under her base salary a "[t]ransfer from [a]nnuity" of $7,500.

For the school years 2005-2006, 2006-2007, and 2007-2008, the SCCOE reported to CalSTRS the amounts of $5,000, $7,500, and $7,500, respectively, as creditable compensation.

### 2. *Employment from November 1, 2007-June 30, 2008*

Wilcox testified that a controversy developed concerning her tenure as Superintendent. It manifested itself through "a little hostility" at board meetings and one member "often [being] argumentative." The controversy led to discussions about her potential resignation as Superintendent.

On September 25, 2007, Wilcox, the SCCOE, and the SCCOE Board entered into an agreement concerning Wilcox's employment, entitled "Settlement Agreement and Release of All Claims" (Settlement Agreement). (Boldface & capitalization omitted.) Wilcox agreed to resign as Superintendent, effective November 1, 2007, but would continue as an employee (with no stated job title) until July 1, 2008, being paid at an annual rate of $282,000. The parties agreed further that the SCCOE Board, "or its delegate, [would] consult with WILCOX so that the job duties and responsibility assigned to her [would] constitute creditable service for retirement purposes."[2]

On November 9, 2007, the SCCOE Board sent a memorandum advising Wilcox that she would "be a contracted employee of the Office" with the job title of "*Special Assistant to the Board-Certificated*." The SCCOE Board stated that Wilcox "may be

---

[2] The terms of the Settlement Agreement are described in detail, *post*.

4

assigned to special projects," and that Acting Superintendent "Joe Fimiani may call upon [her] as necessary."

Wilcox resigned as an employee of SCCOE effective June 30, 2008. The SCCOE reported to CalSTRS that Wilcox had received creditable compensation from November 1, 2007 to June 30, 2008, and two-thirds of a year of service credit of $188,000.

### B.     Administrative Proceedings

CalSTRS issued a decision letter on May 25, 2016, advising Wilcox that certain salary that was transferred from her deferred compensation fund, and compensation received under the Settlement Agreement did not qualify as creditable compensation in determining her retirement benefits. Specifically, CalSTRS advised Wilcox that the following items of compensation were improperly included as creditable: (1) "$5000.00 in the 2005-06 fiscal year"; (2) "$7,500.00 in the 2006-07 fiscal year"; (3) "$7,500.00 in the 2007-08 fiscal year for a tax-deferred compensation plan"; and (4) "[t]he $188,000.00 in compensation [Wilcox was] paid and the .667 years of service credit which was reported from November 1, 2007 through June 30, 2008 due to a settlement agreement."

Wilcox, through her attorney, challenged the decision letter's conclusions in a detailed letter of August 8, 2016. She requested that CalSTRS conduct an executive review of the decision letter. After its review, CalSTRS upheld its findings in a July 26, 2017 determination letter. Wilcox made a timely request for an administrative hearing. CalSTRS filed a Statement of Issues on or about October 12, 2018. It alleged that the SCCOE had misreported as creditable compensation received by Wilcox for the school years 2005-2006, 2006-2007, and 2007-2008. "As a result, [Wilcox's] retirement benefit was calculated inaccurately and she received an inflated monthly benefit that was not in compliance with the Teachers' Retirement Law."

After an administrative hearing on August 19, 2019, and written closing arguments, the ALJ issued a proposed decision on November 20, 2019, denying Wilcox's

appeal.  On February 3, 2019, the CalSTRS Appeals Committee adopted the ALJ's proposed decision, with minor revisions.  It was concluded in the Administrative Decision that the four items of Wilcox's compensation identified in CalSTRS's decision letter (as described above) were erroneously classified by the SCCOE as creditable for retirement purposes.

Regarding the additional reportable wages that Wilcox elected to receive beyond her fixed salary for the school years of 2005-2006 ($5,000), 2006-2007 ($7,500), and 2007-2008 ($7,500), the Appeals Committee concluded that "[t]he evidence established that [Wilcox] elected to take funds specifically designated for a tax-deferred retirement plan and elected to have those funds paid to her as salary.  This was not a permanent restructure of her pay rate."  The Appeals Committee found further that "the principal purpose of [Wilcox's] transfers for the 2005-06, 2006-07, and 2007-08 school years from her tax-deferred compensation to salary was to enhance her retirement benefits."  It was therefore held that the compensation Wilcox elected to transfer from deferred compensation to salary were misreported as creditable by the SCCOE.

The Appeals Committee held further that after Wilcox resigned as Superintendent by executing the Settlement Agreement, she did "not perform[] activities that qualified as creditable service."  The Appeals Committee, instead, found that Wilcox had not performed "substantive work directly related to performing the duties of a superintendent[ and t]here was no corroborating evidence that [she] worked on any special projects. . . [or that there were] any new tasks that she performed for SCCOE between November 1 2008 and June 30, 2008."  The Appeals Committee therefore held that the SCCOE had "misreported $188,000 as creditable compensation and misreported .667 years of service credit," reasoning that the compensation was excluded under

6

section 22119.2, subdivision (d),[3] and Wilcox "did not engage in the type of activities that qualify as creditable service under . . . section 22119.5."

Lastly, the Appeals Committee addressed and rejected three defenses that were asserted by Wilcox. First, it concluded that CalSTRS was not barred by the applicable statute of limitations (§ 22008) from "seeking to reverse the incorrectly reported payments." Second, the Appeals Committee held that CalSTRS was not equitably estopped from recovering overpayments of pension benefits received by Wilcox. Third, the Appeals Committee concluded that CalSTRS was not barred by laches from recalculating Wilcox's pension benefits to address the SCCOE's misreporting of compensation as creditable.

### C.      Court Proceedings

Wilcox filed a petition for writ of mandate in the court below on March 20, 2020. After briefing, argument on October 22, 2020, and post-hearing briefing, the court issued its order on January 11, 2021 (the Order). Judgment was entered on September 1, 2021.

The court—except as it concerned the issue of the applicability of the statute of limitations (discussed below)—upheld the Administrative Decision of the Appeals Committee. It concluded that the allocation by Wilcox of a total of $20,000 for the school years of 2005-2006, 2006-2007, and 2007-2008 as additional wages from the deferred compensation fund was incorrectly reported by the SCCOE as creditable. The court held that the facts that the funds Wilcox directed as additional wages had "never actually [been placed] into a tax deferred fund and [were] taxable as additional wages . . . [were] not dispositive. Clearly and undeniably, the money came out of a fund that was separate from her fixed salary and designated as a benefit regardless of her decision to

---

[3] The Administrative Decision refers to the statute identifying express exclusions to " '[c]reditable compensation' " as section 22119.2, subdivision (c). By amendment of section 22119.2, effective after the ALJ's filing of her proposed decision, the text concerning such exclusions was redesignated under subdivision (d). (See Stats. 2019, ch. 96, § 3.)

7

allocate it as additional wages. [Wilcox's] contract with the [SCCOE Board] provided for a fixed salary and also provided her with an additional amount of money to be allocated to a tax-deferred plan or allocated as wages as a separate benefit from her fixed salary. The conversion of the tax-deferred compensation payments did not constitute a permanent restructure of her salary because there was no permanent change to her salary and her decision to convert tax-deferred compensation into additional wages was within her discretion on a year-to-year basis."

In the Order, the court next considered Wilcox's arguments challenging (and CalSTRS's arguments supporting) the Administrative Decision finding that the SCCOE had improperly reported her November 2007 through June 2008 compensation as creditable. In its recital of the parties' arguments, the court noted that Wilcox had asserted that CalSTRS was barred by laches from claiming that this eight months of compensation was not creditable. The trial court acknowledged that Wilcox had been disadvantaged due to the length of time that transpired from when she performed the work in 2007-2008 to the administrative hearing in 2019. The court, however, concluded that (1) the evidence in the administrative record did not establish that her compensation received after she resigned as Superintendent was creditable, and (2) laches was unavailable to her as a defense because, although "[Wilcox] may have prejudiced by the delay, there is a strong public policy of protecting the integrity of a public retirement fund and . . . she had no right to excess retirement benefits."

Lastly, the trial court considered Wilcox's contention that CalSTRS's claims were barred at least in part by the three-year statute of limitations as provided under section 22008. Under subdivision (a) of that statute, an action seeking adjustments for erroneous payments under the Defined Benefit Program or the Defined Benefit Supplement Program must be brought within "three years after all obligations . . . have been discharged." Subdivision (c) of section 22008 provides: "If an incorrect payment is due to lack of information or inaccurate information regarding the eligibility of a

8

member, former member, beneficiary, or annuity beneficiary to receive benefits under the Defined Benefit Program or Defined Benefit Supplement Program, the period of limitations shall commence with the discovery of the incorrect payment." The statute of limitations for bringing an action to recoup overpayments "commence[s] with . . . 'discovery of the incorrect payment.' . . . '[D]iscovery' means the date CalSTRS actually discovered, or in the exercise of reasonable diligence should have discovered, the incorrect payment." (*Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 348 (*Baxter*); see also *id.* at pp. 356-363.) The trial court here concluded that CalSTRS was placed on inquiry notice in May 2013, when it received an e-mail from Lesley King of the SCCOE indicating that Wilcox had not performed creditable service. Since the statement of issues for the administrative proceeding was not filed by CalSTRS until October 2018, the trial court, relying on *Baxter*, held that the statute of limitations barred CalSTRS's overpayment claims prior to October 10, 2015, but that such claims after that date were not time-barred.[4]

The trial court therefore granted Wilcox's petition for writ of mandate in part (as to CalSTRS's claims that were held by the court to be time-barred) and otherwise denied the petition. Judgment was entered on September 1, 2021.

Wilcox filed a notice of appeal from the judgment.

---

[4] CalSTRS did not file a cross-appeal challenging the trial court's decision that the three-year statute of limitations barred CalSTRS's overpayment claims prior to October 10, 2015. CalSTRS confirmed in its respondent's brief that it "does not dispute this outcome" concerning the statute of limitations acting as a partial bar to CalSTRS's overpayment claim. Similarly, Wilcox on appeal does not challenge the court's Order insofar as it concludes that CalSTRS is not barred by the statute of limitations from pursuing overpayment claims on or after October 10, 2015.

## III.    DISCUSSION

### A.    Administrative Mandamus

A party may file a petition for writ of administrative mandamus "for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (Code Civ. Proc., § 1094.5, subd. (a).) Administrative mandamus under Code of Civil Procedure section 1094.5 is the exclusive remedy for judicial review of the quasi-adjudicatory administrative action of state-level agencies following a hearing. (*People v. County of Tulare* (1955) 45 Cal.2d 317, 319.)

The matters that may be addressed by the court in a mandamus proceeding are whether the agency "has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).)  Under the statute, the petitioner establishes that the agency abused its discretion by showing that it "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)  The superior court, in reviewing whether the agency's findings are supported by the evidence, applies either the substantial evidence standard or the independent judgment standard. (*Id.*, subd. (c).)[5]

In cases where the "administrative decision[] . . . substantially affect[s] vested, fundamental rights," the trial court "exercises its independent judgment upon the evidence disclosed in a limited trial de novo." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143,

---

[5] "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)

10

fn. omitted.) But even in cases where the independent judgment standard applies, the trial court gives considerable weight to the agency's decision: "[A] trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*).) Agency decisions involving retirement benefits have long been considered matters affecting vested fundamental rights and, as such, are subject to independent review by the superior court. (See *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 45-46 (*Strumsky*); see also *O'Connor v. State Teachers' Retirement System* (1996) 43 Cal.App.4th 1610, 1620 (*O'Connor*).)

### B. Appellate Standard of Review

As an appellate court—regardless of whether the trial court independently reviews administrative findings or reviews them for substantial evidence—we review the trial court's findings in an administrative mandamus proceeding for substantial evidence. (*Fukuda*, *supra*, 20 Cal.4th at p. 824.) "If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review. [Citations.]" (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058 (*JKH Enterprises*).)

In this case, therefore, "we review the trial court's factual findings for substantial evidence. In doing so, we must resolve all conflicts in favor of CalSTRS, the party prevailing below. Further, we cannot reweigh the evidence. Thus, we do not determine whether substantial evidence would have supported a contrary judgment, but only whether substantial evidence supports the judgment actually made by the trial court. [Citations.] In sum, '[t]he question on appeal is whether the evidence reveals substantial support—contradicted or uncontradicted—for the trial court's conclusion that the weight

11

of the evidence supports the [agency's] findings of fact. [Citation.] We uphold the trial court's findings unless they so lack evidentiary support that they are unreasonable.' [Citation.]" (*Duarte v. State Teachers' Retirement System* (2014) 232 Cal.App.4th 370, 384 (*Duarte*).)[6]

"Pure questions of law decided by the trial court are reviewed de novo by the Court of Appeal. [Citation.] In such instances, the appellate court is not 'bound by the findings of the trial court. [Citations.]' [Citation.] Pure legal questions include the interpretation of statutes [citations], and municipal laws [citation]." (*Baxter*, *supra*, 18 Cal.App.5th at p. 353.)

An agency's interpretation of a statute or ordinance is given deference by the court. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219.) Thus, " '. . . "[i]n determining the proper interpretation of a statute and the validity of an administrative regulation, the administrative agency's construction is entitled to great weight, and if there appears to be a reasonable basis for it, a court will not substitute its judgment for that of the administrative body." [Citations.]' "

[6] In her opening brief, Wilcox contends, erroneously, that our review of this matter is the same as the trial court's review, namely, that we must review the *agency's* decision to determine whether the administrative record is supported by substantial evidence. This assertion is renewed in Wilcox's reply brief. Wilcox thus focuses upon the Administrative Decision adopted by the CalSTRS Appeals Committee. In support of this position, counsel for Wilcox cites, and appears to quote *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412 (*Vineyard Area*). There, the California Supreme Court held: "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.]" (*Id.* at p. 427.) The instant mandamus case is not a CEQA case. And here, unlike the circumstances in *Vineyard Area*, the Administrative Decision being reviewed substantially affected fundamental vested rights and was thus subject to independent review by the trial court. (See *Strumsky*, *supra*, 11 Cal.3d at pp. 45-46.) Therefore, "on appeal we are only concerned with the *superior court's* findings. (*JKH Enterprises,* [*supra*], 142 Cal.App.4th [at p.] 1058 . . . ; [citations].)" (*Espinoza v. Shiomoto* (2017) 10 Cal.App.5th 85, 117, original italics.)

(*O'Connor*, *supra*, 43 Cal.App.4th at p. 1620; see also *California State Teachers'*
*Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 54 [" 'agency
interpretation of the meaning and legal effect of a statute is entitled to consideration and
respect by the courts' "].)  But it is ultimately " ' "for the courts, not for administrative
agencies, to lay down the governing principles of law." ' " (*Garamendi v. Mission Ins.*
*Co.* (2005) 131 Cal.App.4th 30, 41.)  "Courts must . . . independently judge the text of
the statute, taking into account and respecting the agency's interpretation of its meaning,
of course, whether embodied in a formal rule or less formal representation.  Where the
meaning and legal effect of a statute is the issue, an agency's interpretation is one among
several tools available to the court." (*Yamaha Corp. of America v. State Bd. of*
*Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha Corp.*).)

### C.    Review of Trial Court Judgment

In our review of the judgment, we will consider three main questions.  First, we
will address whether the trial court erred in upholding the Appeals Committee's
determination that the amounts from her deferred compensation fund that Wilcox elected
to receive as additional salary for three school years (spanning from 2005 to 2008 and
totaling $20,000) were incorrectly reported by SCCOE as creditable.  Second, we will
consider whether the trial court erred in sustaining the Appeals Committee's
determination that the compensation Wilcox received from November 1, 2007, through
June 30, 2008 ($188,000) was also incorrectly reported by SCCOE as creditable, thereby
inflating her retirement benefits.  Third, we address whether the trial court erred in
concluding that the Appeals Committee properly rejected Wilcox's assertion that
CalSTRS was barred by laches from challenging the SCCOE's reporting of her
compensation as creditable.[7]

---

[7] In the administrative proceeding, Wilcox specifically alleged as an affirmative
defense and argued in its post-hearing brief that CalSTRS was barred under principles of
(continued)

13

Preceding the discussion of the issues in this appeal is a discussion of the Teachers' Retirement Law, the role of CalSTRS, and general principles concerning the administration of the Teachers' Retirement Fund.

### 1. Background: Teachers' Retirement Law

"CalSTRS was created by the Legislature in 1913 as a retirement system for credentialed California teachers and administrators in kindergarten through community college. [Citation.] The CalSTRS Board is responsible for the administration of CalSTRS, including implementation of the State Teachers' Retirement Plan (plan), and 'shall set policy and shall have the sole power and authority to hear and determine all facts pertaining to application for benefits under the plan or any matters pertaining to administration of the plan and [CalSTRS].' [Citations.] The CalSTRS Board has fiduciary obligations—both statutory and constitutional—to soundly administer the plan and maintain its fiscal integrity. [Citations.]" (*Duarte*, *supra*, 232 Cal.App.4th at pp. 384-385.)

As was explained further in *Duarte*: "The constitutional obligations of a public retirement board such as the CalSTRS Board have been interpreted to include a duty 'to "ensure the rights of members and retirees to their full, *earned* benefits." ' [Citation.] *Such obligations therefore do not permit the payment of benefits not otherwise*

_____

equitable estoppel from taking corrective action with respect to the SCCOE's incorrect reporting of her compensation ($20,000 taken as additional wages from 2005-2008 and $188,000 received after her resignation as Superintendent) as creditable. The Appeals Committee rejected this defense, concluding in the Administrative Decision that Wilcox had failed to establish all requisite elements of equitable estoppel. Wilcox did not raise equitable estoppel as a defense in her mandamus proceeding before the trial court, and the court did not address such defense in its Order. She also does not raise equitable estoppel in her appellate briefs. Wilcox has thus waived (or forfeited) any right to assert that CalSTRS was barred under the doctrine of equitable estoppel. (See *Children's Hospital & Medical Center v. Bonta* (2002) 97 Cal.App.4th 740, 776 [appellant's failure to assert theory either at the trial level or in its opening brief renders the issue " 'doubly waived' "],)

14

*authorized.* [Citation.]" (*Duarte*, *supra*, 232 Cal.App.4th at p. 385, second italics added.) In the same vein, "public agencies are not free to define their employee contributions as compensation or not compensation . . . the Legislature makes those determinations." (*Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 201.)

The central issue in this case is whether certain compensation received by Wilcox was properly classified by her employer, SCCOE, as "creditable." "Under the statutory framework, retirement allowances are calculated by the administrator, CalSTRS, based upon a member's compensation earnable in his or her final compensation period. [Citations.]" (*Blaser v. State Teachers' Retirement System* (2022) 86 Cal.App.5th 507, 533 (*Blaser II*), boldface & italics omitted, fn. omitted.) The Education Code defines " '[c]reditable compensation' " as "remuneration that is paid in cash by an employer to all persons in the same class of employees for performing creditable service in that position." (§ 22119.2, subd. (a).) Such " '[c]reditable compensation' " includes "[s]alary or wages paid in accordance with a publicly available written contractual agreement, including, but not limited to, a salary schedule or employment agreement," and "[r]emuneration that is paid in addition to salary or wages, provided it is paid to all persons who are in the same class of employees in the same dollar amount, the same percentage of salary or wages, or the same percentage of the amount being distributed." (*Id.*, subd. (a)(1), (2).)

Under section 22119.2, " '[c]reditable compensation' " excludes "[p]ayments . . . for participation in a deferred compensation plan. . . when the cost is covered by an employer and is not deducted from the member's salary." (*Id.*, subd. (d)(5).) Also excluded as " '[c]reditable compensation' " is "[s]everance pay, including lump-sum and installment payments, or money paid in excess of salary or wages to a member as compensatory damages or as a compromise settlement." (*Id.*, subd. (d)(8).) And the Education Code excludes as " '[c]reditable compensation' " "[a]ny other payments the board determines not to be 'creditable compensation.' " (*Id.*, subd. (d)(9).)

15

"Additionally, the policy considerations of 'creditable compensation' are delineated in the statute:  'This definition of "creditable compensation" reflects sound principles that support the integrity of the retirement fund.  Those principles include, but are not limited to, consistent treatment of compensation throughout a member's career, consistent treatment of compensation among an entire class of employees, consistent treatment of compensation for the position, preventing adverse selection, and excluding from compensation earnable remuneration that is paid to enhance a member's benefits. . . .'  [Citation.]"  (*Blaser II*, *supra*, 86 Cal.App.5th at p. 534, quoting § 22119.2, subd. (g), boldface & italics omitted.)

### 2.    *Additional Salary Paid 2005-2008*

### a.    **Evidence (Documentary)**

Under the four-year Employment Contract dated November 10, 2003 (paragraph 3, "Compensation," subparagraph a, "Salary"), Wilcox was to receive an annual salary of $192,328.[8]  In a separate section of that contract (paragraph 3, "Compensation," subparagraph b, "Benefits," sub-subparagraph (9)), Wilcox was to receive on July 1 of each year of the contract $20,050 to be paid "into a deferred compensation fund (e.g. an Internal Revenue Code section 457 plan) or as additional wages as designated and directed by the County Superintendent."  Wilcox was required to give written notice to the SCCOE Board 30 days before July 1 if she wished to receive "the . . . sum in deferred compensation arrangement."

There were two subsequent employment contracts executed by Wilcox and the SCCOE Board.  Although the amount designated for annual salary increased in those subsequent contracts, and the amount of annual deferred compensation changed (from $20,050 to $20,000, and then to $12,500), the text of the paragraphs in the Employment

---

[8] That annual salary figure increased over time to $220,533, to $243,580, and to $262,454.

Agreement and the two later contracts with respect to base salary and deferred compensation was otherwise identical.

On May 17, 2005, Wilcox elected in writing to accept as "additional salary" $5,000 from the total amount of $20,050 of her deferred compensation for the 2005-2006 school year, thereby leaving $15,050 as deferred compensation. In her letter, she stated: "Section 3.b.9 of my MOU allots $20,050 each year into a deferred compensation fund. . . . To that end, I am electing to transfer $5,000 of that fund toward my annual salary." Wilcox also stated: "I have been advised by a STRS representative that it is wise to do so gradually before retirement so [as] not to create an apparent 'spike' in salary upon retirement."

Similarly, on May 23, 2006, Wilcox elected in writing to accept $7,500 as "additional salary" from the total amount of $20,000 of her deferred compensation for the 2006-2007 school year. Wilcox stated that she was "electing to transfer $7,500 of [the deferred compensation] fund toward [her] annual salary. . . [thereby] reduc[ing her] deferred compensation plan to $12,500 per year and increase [her] salary by $7,500."

And on May 3, 2007, Wilcox elected in writing to accept as "additional salary" $7,500 from the total amount of $12,500 of her deferred compensation for the 2007-2008 school year. Wilcox stated that she was "electing to transfer $7,500 of [the deferred compensation] fund toward [her] annual salary. . . [thereby] reduc[ing her] deferred compensation plan to $5,000 per year and increase [her] salary by $7,500."

### b. Evidence: Testimony

Jody Cozad, manager of two units of CalSTRS, testified at the administrative hearing that he was involved in Wilcox's compensation review that led to the issuance of the CalSTRS decision letter in 2016. CalSTRS's determination that the three payments directed by Wilcox from the deferred compensation fund to additional salary were not creditable was based in part upon the fact that the provision of the Employment Contract specifying that Wilcox would receive $20,050 as deferred compensation (paragraph 9 of

17

the benefits section) was separate and apart from the salary provision on page one of the contract. Cozad testified that two subsequent employment contracts involving Wilcox and the SCCOE Board were similarly structured to provide Wilcox with her specified salary on page one of the contracts, and, in a separate section involving benefits, with deferred compensation. Cozad indicated that the funds committed under paragraph 9 were treated in SCCOE Board minutes and memoranda as deferred compensation. Specifically, Wilcox, in three memoranda, elected to receive from the deferred compensation fund the sums of $5,000, $7,500, and $7,500 as additional salary, thereby decreasing the plan amounts. The fact that Wilcox was permitted under the contract to designate the compensation as additional salary did not change Cozad's view that the funds were deferred compensation that were not creditable.

Leon Beauchman, former SCCOE Board Member, testified that the Board ultimately hired Charles Weis as Superintendent to succeed Wilcox, effective July 1, 2018. Weis's employment contract included a provision granting him deferred compensation. Unlike Wilcox's Employment Contract (and two subsequent employment contracts), Weis's employment contract did not provide that he could elect to receive the deferred compensation as additional salary.[9]

Wilcox testified at the hearing that when she entered into her employment contract, it was her understanding that the $20,050 specified in paragraph 9 of the benefits provision that this amount was a "salary increase [that she] could take . . . in tax sheltered annuity or in salary." Wilcox consulted with a CalSTRS representative

---

[9] The provision of the Weis employment agreement, under the heading "DEFERRED COMPENSATION," read as follows: "For the term of this Agreement the Board shall pay annually at County Superintendent's election, the sum of $20,000.00 or the limit allowed by law, whichever is less, into an IRC 457 deferred compensation fund established for County Superintendent. County Superintendent shall provide the Board and the SCCOB payroll department at least thirty (30) days prior written notice of such election."

before electing in 2005-2006 to have $5,000 transferred from deferred compensation to additional salary. She was not told then (or at a later time) that by doing so, she ran the risk that the transferred amount would be not creditable.

### c. Administrative Decision

In the Administrative Decision, confirmed by the Committee, the ALJ found that the funds that Wilcox elected to have paid as additional salary—totaling $20,000 over three years—were not creditable because they did not involve "a permanent restructure of her pay rate." The ALJ concluded further "that the principal purpose of [Wilcox's] transfers for the 2005-06, 2006-2007, and 2007-08 school years from her tax-deferred compensation to salary was to enhance her retirement benefits." It was therefore concluded by the ALJ that the SCCOE had misreported the compensation because "these funds were for a tax-deferred compensation plan . . . . As such, the additional compensation is excluded pursuant to Education Code section 22119.2, subdivision [(d)(5)], because the payments were for participation in a tax-deferred compensation plan which is not creditable."

### d. Trial Court Decision

The trial court found "that the ALJ properly concluded that the District erroneously reported compensation from [Wilcox's] deferred compensation plan as creditable compensation." The court concluded that the circumstances that the funds that were diverted had not actually been placed into a deferred fund were "not dispositive. Clearly and undeniably, the money came out of a fund that was separate from [Wilcox's] fixed salary and designated as a benefit regardless of her decision to allocate it as additional wages. [Her] contract with [SCCOE] provided for a fixed salary and also provided her with an additional amount of money to be allocated to a tax-deferred plan or allocated as wages as a separate benefit from her fixed salary."

19

### e. Analysis

We conclude that there was substantial evidence—indeed, the relevant facts were undisputed—supporting the trial court's conclusion. On its face, the Employment Contract specified that the origin of the funds, although diverted at Wilcox's election to additional wages, was a deferred compensation fund established for the employee's benefit without deduction from her salary. As such, they were not creditable under the Teachers' Retirement Law. (See § 22119.2, subd. (d)(5) [" '[c]reditable compensation' " excludes "[p]ayments . . . for participation in a deferred compensation plan. . . when the cost is covered by an employer and is not deducted from the member's salary"].) Further, it is significant that the Employment Agreement made provision for the deferred compensation fund in a section captioned "Benefits" that was separate and apart from a section earlier in the document captioned "Salary." And we agree with the trial court that the fact that the funds had not been specifically placed into a deferred fund and the fact that Wilcox's receipt of the funds was subject to taxation do not render the additional income creditable for retirement purposes.

The trial court's conclusion that the $20,000 that Wilcox elected to receive as additional salary during the three school years (2005-2006, 2006-2007, and 2007-2008) was not creditable was supported further by the CalSTRS-promulgated Employer Directive 2003-2004 (the Directive). The Directive was intended, inter alia, to clarify the standards under which compensation was creditable, and it applied "to all county superintendent of schools, school districts; community college districts and other employing agencies that employ persons to perform creditable service subject to coverage under the State Teachers' Retirement Plan." Under the Directive, CalSTRS advised that "[a] restructure of compensation into salary that was formerly used to provide fringe benefits" would "not have an adverse impact on the integrity of the [Teachers'] Retirement Fund" and was thus creditable if it met various conditions; one such condition was that the restructure "be intended as a permanent change in the

20

employer's business practice." (See *Yamaha Corp.*, *supra*, 19 Cal.4th at p. 7 ["[a]n agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts"].)

The trial court concluded that the restructure of Wilcox's compensation for the three school years, done at her election, "did not constitute a permanent restructure of her salary because there was no permanent change to her salary and her decision to convert tax-deferred compensation into additional wages was within her discretion on a year-to-year basis." This conclusion was supported by substantial evidence. In each of the three school years, Wilcox had the discretion to designate all, some, or none of the funds identified under her employment agreement as deferred compensation as additional wages. There was no evidence that, either as agreed or as implemented by Wilcox, any restructure of compensation as additional salary was intended as a "permanent change."

Lastly, the trial court's determination that the $20,000 that Wilcox elected to receive as additional salary, rather than as deferred compensation, was not creditable was supported by the policy objectives expressly stated in the Teachers' Retirement Law: "This definition of 'creditable compensation' [stated in § 22119.2, subd. (a)] reflects sound principles that support the integrity of the retirement fund. Those principles include . . . consistent treatment of compensation throughout a member's career, consistent treatment of compensation among an entire class of employees, consistent treatment of compensation for the position, preventing adverse selection, and excluding from compensation earnable remuneration that is paid to enhance a member's benefits." (§ 22119.2, subd. (g).) There was evidence presented at the hearing that, were Wilcox's salary held creditable, it would mean that the SCCOE had *not* adhered to the policy of providing for the "consistent treatment of compensation among an entire class of employees, [or the] consistent treatment of compensation for the position." (*Ibid.*) Weis, the Superintendent who succeeded Wilcox, was not afforded the opportunity in his

21

employment contract to elect to transfer funds committed as deferred compensation to additional salary.[10]

There was substantial evidence to support the trial court's conclusion that the SCCOE improperly reported as creditable the additional salary Wilcox elected to receive from the deferred compensation fund contractually established for her benefit for the 2005-2006, 2006-2007, and 2007-2008 school years. (See *Fukuda*, *supra*, 20 Cal.4th at p. 824; *Duarte*, *supra*, 232 Cal.App.4th at p. 384.)

### 3. *Salary Paid November 2007 through June 2008*

#### a. **Evidence: The Settlement Agreement**

The second material issue decided by the Appeals Committee, which decision was reviewed by the trial court, was whether the payments received by Wilcox from November 1, 2007 to July 1, 2008, were properly reported by the SCCOE to CalSTRS as creditable. Resolution of this question involves a review of the testimony presented, and close consideration of the terms of the September 25, 2007 Settlement Agreement executed by Wilcox, SCCOE, and the SCCOE Board.[11] The relevant terms of that Settlement Agreement include the following:

(1) Wilcox agreed to resign as Superintendent, effective November 1, 2007.

(2) As of November 1, 2007, Wilcox would continue to be an SCCOE employee with a job "title, job duties and responsibilities and reporting relationship as may be directed by the BOARD."

(3) Wilcox would "perform assignments off site."

---

[10] Although this evidence and this policy objective were not specifically referenced by the trial court, the Appeals Committee concluded that the "SCCOE was inconsistent in its treatment of [Wilcox's] ability to convert funds from the tax-deferred retirement plan when her successor was not provided the same opportunity."

[11] Wilcox and SCCOE/SCCOE Board were represented by their respective counsel "in connection with [the] matter."

22

(4) Wilcox—under the heading "Settlement Payments"—would be paid from November 1, 2007, to July 1, 2008, at the annual rate of $282,000.

(5) As of November 1, 2007, Wilcox would "cease to accrue any further vacation or sick leave."[12]

(6) Wilcox agreed to resign her (at the time, untitled) position with SCCOE "[n]o later than July 1, 2008."

(7) In the event Wilcox submitted her resignation after January 1, 2008, and before July 1, 2008, she would be paid "in a lump sum an amount equal to the value of her unpaid salary and benefits that would have been payable from the date of such resignation through July 1, 2008."

(8) Upon her resignation, Wilcox would receive in severance—either in two equal sums (on July 1, 2008, and January 2, 2009, or in 12 monthly installments— "her current salary at the annual salary rate of $274,000 . . . , plus the value of 18 months of COBRA benefits."[13]

(9) The SCCOE Board, "or its delegate, [would] consult with WILCOX so that the job duties and responsibility assigned to her [would] constitute creditable service for retirement purposes."

(10) If any conflict existed between the provisions of the Settlement Agreement and Wilcox's then-current employment agreement of September 20, 2006, the terms of the Settlement Agreement would control.

---

[12] Under her employment contract in effect at the time she executed the Settlement Agreement, Wilcox received 26 working days' vacation per year and 12 days' annual sick leave.

[13] As a result of her execution of the Settlement Agreement, Wilcox elected in effect to forgo six months of severance benefits. Under her employment contract in effect immediately before she executed the Settlement Agreement, Wilcox would have received, had she resigned at the SCCOE Board's request on or before July 1, 2008, 18 months' severance pay at her existing annual salary.

(11) The parties agreed to a mutual nondisparagement clause and agreed to keep the terms of the Settlement Agreement confidential to the extent permitted by law.

(12) The parties agreed to a mutual release of all claims arising out of Wilcox's employment.

(13) Wilcox agreed to indemnify and hold harmless the SCCOE of and from any liability arising from any future claim by any person or entity "as a result of any injury to WILCOX as described in this release."

(14) The parties agreed that the agreement was "a compromise settlement and that the consideration for this release shall not be deemed to be or construed as an admission of liability to WILCOX . . . by the [SC]COE."

On November 9, 2007—after the effective date of Wilcox's resignation as Superintendent—the SCCOE Board issued a memorandum that recited that it was an "explanation of the Office's plan for implementing the Settlement Agreement." It was stated in the memorandum that Wilcox would "be a contracted employee of the Office although not a member of the Management Team." Wilcox was given a new job title as "*Special Assistant to the Board-Certificated.*" The extent of her job duties, as delineated in the memorandum, were stated as follows: Wilcox "may be assigned to special projects by the Board per Ed. Code [§] 1042(d)." Wilcox was to "report directly to the [SCCOE] Board President," and it was stated that "Joe Fimiani [Acting Superintendent] may call upon [her] as necessary." It was stated further that "[n]o clerical support, supplies or equipment [would] be provided" to Wilcox.

### b.    Evidence:  Testimony

Manager Jody Cozad testified at the administrative hearing that during its review, CalSTRS inquired about Wilcox's specific job assignments and duties from November 1, 2007, and December 31, 2009; SCCOE responded that " '[n]o job assignments were given to Ms. Wilcox during that period.' " Cozad testified that during the review,

24

CalSTRS inquired of Wilcox as to the work that she performed after November 1, 2007, but she did not provide CalSTRS with information about special projects on which she had worked or assignments she had completed. Cozad concluded from his review that there was no evidence that Wilcox had performed creditable work from November 1, 2007 to June 30, 2008.

Former SCCOE Board member Beauchman testified that at the time Wilcox resigned as Superintendent, the SCCOE Board wanted her to remain to assist during the transition by providing advice to the interim Superintendent and then to the permanent Superintendent. Beauchman testified that "it was pretty general as far as what [Wilcox] was going to be supporting."

Beauchman testified that the SCCOE Board, in its negotiations concerning Wilcox's resignation as Superintendent, did not "try[] to structure something or create a term, so to speak, that would have an implication on her retirement." Beauchman could not recall any special projects that were assigned to Wilcox after she resigned as Superintendent. Although he could not recall any specific issues, Beauchman believed that he had spoken with Wilcox on more than one occasion after she resigned as Superintendent "about what was going on, just generally how things were going."

Wilcox testified that she signed the Settlement Agreement setting forth the terms of her resignation as Superintendent. The annualized amount of her compensation under the agreement ($282,000) was approximately the amount of her annual salary as Superintendent when she resigned. Wilcox testified that her last employment agreement entitled her to 18 months' severance, only; 12 months' severance was authorized in the Settlement Agreement. She stated further that there were "a lot" of benefits provided under her employment agreement that she did not receive because they were "negotiated" out in the Settlement Agreement, such as health and dental benefits until she was 70 years old.

Wilcox did not have conversations with the SCCOE Board concerning the language in the Settlement Agreement that " '[t]he board or its delegate will consult with Dr. Wilcox so that the job duties and responsibility assigned to her will constitute creditable service for retirement purposes.' " She testified that at the time the Settlement Agreement was negotiated, no one identified any "special projects" that would be assigned to her in her new position. Wilcox stated that she had worked on one or two "small projects," but that she could not recall the specifics, given the passage of time.

Wilcox testified that she had worked at least 70 hours per week as Superintendent, but the number of hours she worked after November 1, 2007, were "[m]uch less" and "varied greatly." She received calls from all applicants for her former position, but she did not know whether they were specifically referred to her by the SCCOE. One of the applicants was Charles Weis, who was ultimately hired as Wilcox's successor.[14] Wilcox testified that she had (a) one meeting with Fimiani; (b) telephone conversations with the administrative assistants (Katherine O'Casey and Lisa Smith) to the interim Superintendent; (c) met with Beauchman about a budget matter; and (d) met over lunch with the director of the SCCOE's environmental science camp.

Lisa Smith, who was executive assistant to interim Superintendent Fimiani after Wilcox resigned as Superintendent, submitted a declaration in which she stated that from November 2007 through June 2008, she had spoken with Wilcox about SCCOE matters, Wilcox had made herself available to the SCCOE Board; and Wilcox had personally called Board members. Because of the passage of time, Smith was unable to provide specifics about those contacts.[15]

---

[14] Weis declared that between "November 1, 2007, through June 2008, . . . [he] spoke with Dr. Wilcox and met with her to discuss SCCOE operations and Board procedures and activities."

[15] Similarly, a declaration was submitted by Katherine O'Casey, who was an executive administrative assistant between November 2007 and March 2008 reporting (continued)

26

### c.       Administrative Decision

Based upon the evidence, it was concluded in the Administrative Decision "that after [Wilcox] resigned from her position as Superintendent . . . , she was not performing activities that qualified as creditable service."  The Appeals Committee found that "[t]here was insufficient evidence of substantive work directly related to performing the duties of a superintendent.  There was no corroborating evidence that [Wilcox] worked on any special projects.  She only had some telephone conversations and meetings with SCCOE employees, applicants and a[n SCCOE] Board member which related to her previous experience as superintendent.  There was no evidence of any new tasks that she performed for SCCOE between November 1 2008 and June 30, 2008.  There was no evidence that she was teaching, manning courses or preparing instructional materials, selecting or examining teachers, or enforcing laws related to public education; all of which would qualify as creditable service under the Education Code. . . .  It appears that the position of Special Assistant position was created as a compromise settlement to enable [Wilcox] to qualify for creditable service."  Thus, the Appeals Committee held that (1) the "SCCOE misreported $188,000 as creditable compensation and misreported .667 years of service credit"; (2) "the credited additional compensation of $188,000 is excluded pursuant to Education Code section 22119.2, subdivision (c), because it was derived from severance pay pursuant to a compromise settlement which is specifically excluded as creditable compensation"; (3) "[Wilcox] did not earn service credit of .667 years pursuant to Education Code section 22119.2, subdivision (c), because it was derived from a compromise settlement which is specifically excluded as creditable compensation"; and (4) "[Wilcox] did not engage in the type of activities that qualify as creditable service under Education Code section 22119.5."

---

to interim Superintendent Fimliani.  O'Casey declared that during that time frame, she had spoken with Wilcox several times concerning matters about which she could not recall, and that Wilcox spoke with Fimliani.

27

### d.    Trial Court Decision

The trial court—after detailing the evidence presented at the administrative hearing and discussing the terms of the Settlement Agreement—concluded that "[t]he evidence in the administrative record did not support her claim that her services were creditable."

### e.    Analysis

We begin with a discussion of the terms and conditions of the Settlement Agreement itself (and the November 9, 2007 memorandum that followed), which, we conclude, presented substantial evidence to support the trial court's conclusion. Wilcox was required to resign her longstanding position as Superintendent, effective November 1, 2007. Her new position was nonspecific: she would continue to be an SCCOE employee with a job "title, job duties and responsibilities and reporting relationship as may be directed by the BOARD." The SCCOE, in its November 9, 2007 memorandum, gave Wilcox a new job title as "*Special Assistant to the Board-Certificated*." The SCCOE told her that she would "not [be] a member of the Management Team"; she "may be assigned to special projects by the Board"; she was to "report directly to the [SCCOE] Board President"; and that "[Acting Superintendent] Joe Fimiani may call upon [her] as necessary." Under the Settlement Agreement, Wilcox was required to "perform assignments off site." And she was further denied support, confirmed in a November 9, 2007 memorandum that stated she would receive "[n]o clerical support, supplies or equipment."

The SCCOE agreed under the Settlement Agreement to pay Wilcox from November 1, 2007, to July 1, 2008, at the annual rate of $282,000 (an approximation of her prior annual salary as Superintendent). This term was contained under the heading "Settlement Payments." (Original underscoring.) The payment obligation was not termed "wages" or "salary." Thus, Wilcox would receive two-thirds of the annualized amount, i.e., $188,000. She was required to resign her position (unspecified in the

28

Settlement Agreement) "[n]o later than July 1, 2008." Moreover, Wilcox had the option of resigning early—on or after January 1, 2008 and prior to July 1, 2008—*without penalty to receiving the full settlement amount of $188,000*. Thus, at her election, Wilcox could have remained employed for only two months (which, as wages, would translate into $47,000), and would still receive additional "wages" of $141,000. Furthermore, Wilcox's entitlement to the "Settlement Payments" was conditioned on her execution of a release of all claims. (See *Skrbina v. Fleming Companies* (1996) 45 Cal.App.4th 1353, 1367 [employee's entitlement to severance benefits provided in memorandum of agreement was conditioned on his release of the employer as provided in that agreement].)

The Settlement Agreement also provided that Wilcox, as an SCCOE employee, would no longer receive vacation or sick leave as of November 1, 2007, in contrast to her previously receiving 26 days' and 12 days' annual vacation and sick leave, respectively. She was provided with 12 months' severance after her termination on July 1, 2018, which was six months less than the severance benefits under her employment agreement. And under the Settlement Agreement, the SCCOE agreed to provide Wilcox upon her termination "the value of 18 months of COBRA benefits," a term significantly less favorable than under her employment agreement.[16]

We conclude that these provisions of the Settlement Agreement (identified in the previous three paragraphs) *strongly support* the existence of a severance arrangement under which the amounts payable to Wilcox were noncreditable severance payments. (See § 22119.2, subd. (d)(8).)

The testimony from the administrative hearing also supported the conclusion that the payments received by Wilcox under the Settlement Agreement were not creditable.

---

[16] Under her employment agreement, it was agreed that Wilcox, upon her retirement, would receive full health, dental, and vision benefits until she reached the age of 70. (As of July 1, 2008, Wilcox was 59.)

29

Wilcox acknowledged that under that agreement, "[she] didn't receive a lot that [she] was supposed to have received [under her employment agreement]" because "it-was [] negotiated" out. In her testimony, she admitted that, although her compensation remained roughly the same after November 1, 2007, she worked "[m]uch less" than the 70-plus hours a week she worked as Superintendent. According to Wilcox, at the time the Settlement Agreement was negotiated, no one described the nature of any "special projects" to which she might be assigned in her capacity as "*Special Assistant to the Board-Certificated*." And when asked to describe any "special projects" assigned to her between November 1, 2007, and June30, 2008, Wilcox stated that she had worked on one or two "small projects," but that she could not recall the specifics, given the passage of time. Former SCCOE Board member Beauchman could not recall any "special projects" assigned to Wilcox. And as to the work Wilcox specifically recalled performing— fielding calls from applicants for the Superintendent position—she was unable to confirm that it resulted from referrals by the SCCOE.

The trial court's conclusion that the post-November 1, 2017 compensation Wilcox received was not creditable, consistent with the findings in the Administrative Decision, was supported for two essential reasons.

First, it was proper to conclude that the weight of the evidence demonstrated that the compensation was not creditable because it constituted severance payments. The Education Code expressly excludes such payments from being creditable compensation. " 'Creditable compensation' does not mean and shall not include: [¶] . . . [¶] . . . Severance pay, including lump-sum and installment payments, or money paid in excess of salary or wages to a member as compensatory damages or as a compromise settlement." (§ 22119.2, subd. (d)(8).) Here, a strong inference can be drawn from the structure and terms of the Settlement Agreement, and from how it was carried out, that the compensation Wilcox received was "[s]everance pay, including lump-sum and installment payments, or money paid in excess of salary or wages . . . as a compromise

30

settlement." (*Ibid.*) Factors supporting this conclusion, as discussed above, include the Settlement Agreement (1) being a compromise in which Wilcox would receive "Settlement Payments" in exchange for her release of all claims; (2) containing a provision that "the consideration for this release shall not be deemed to be or construed as an admission of liability to WILCOX . . . by the [SC]COE"; (3) requiring Wilcox to hold harmless and indemnify the SCCOE from any future claims brought against it arising out of alleged injuries to Wilcox; (4) lacking specifics as to her ongoing duties as an employee; (5) providing that Wilcox would be entitled to the full amount of the settlement payments even if she resigned as much as four months early; (6) failing to provide for typical employee benefits such as vacation and sick pay; and (7) requiring that Wilcox work "off site."[17]

Second, it was proper to conclude that the weight of the evidence showed that Wilcox, in fact, did not perform work after November 1, 2007, that was creditable. Although her prior work as Superintendent was creditable by an express provision of the California Teachers' Law (see § 22119.5, subd. (c)(1)), it was very doubtful that her work as "*Special Assistant to the Board-Certificated*" met the statutory requirements. Activities that are identified as creditable are "(1) The work of teachers, instructors, district interns, and academic employees employed in the instructional program for pupils. . . . [¶] (2) Education or vocational counseling, guidance, and placement services. [¶] (3) The work of employees who plan courses of study to be used in California public

---

[17] Wilcox argues that its title notwithstanding, the Settlement Agreement was not a "settlement agreement" as contemplated under the Teachers' Retirement Law. We disagree for the reasons we have discussed. We observe further that the Settlement Agreement here contains provisions that are typical of a standard settlement agreement, such as a release of all claims, a clause indicating that the payor of settlement monies does so without admission of liability, an indemnification provision under which the releasor indemnifies the releasee, a confidentiality provision, and the express use of the terms "settlement" and "compromise" in describing the contractual arrangement. (See *J.B.B. Investment Partners Ltd. v. Fair* (2019) 37 Cal.App.5th 1, 12 ["standard settlement terms" included, inter alia, waiver of unknown claims and an indemnification provision].)

31

schools, or research connected with the evaluation or efficiency of the instructional program. [¶] (4) The selection, collection, preparation, classification, demonstration, or evaluation of instructional materials of any course of study . . . or other services related to California public school curriculum. [¶] (5) The examination, selection, in-service training, mentoring, or assignment of teachers, principals, or other similar personnel involved in the instructional program. [¶] (6) The work of nurses, physicians, speech therapists, psychologists, audiologists, and other California public school health professionals. [¶] (7) Services as a California public school librarian. [¶] (8) Activities connected with the enforcement of the laws relating to compulsory education, coordination of child welfare activities involving the school and the home, and the school adjustment of pupils. [¶] (9) The work of employees who are responsible for the supervision of persons or administration of the duties described in this subdivision." (§ 22119.5, subd. (b).) The evidence here was that the types of work performed by Wilcox after November 1, 2007 consisted of (a) talking to potential applicants for the Superintendent position; (b) meeting with Beauchman about an unspecified budget matter; (c) working on one or two "small projects"; (d) attending one meeting with Fimiani; (e) having telephone conversations with administrative assistants (Katherine O'Casey and Lisa Smith); and (f) meeting over lunch with the director of the SCCOE's environmental science camp. These activities do not fall within the categories of creditable work enumerated in section 22119.5, subdivision (b).

There was substantial evidence to support the trial court's conclusion that the compensation Wilcox received after her resignation as Superintendent was not creditable and had therefore been misreported by the SCCOE. (See *Fukuda*, *supra*, 20 Cal.4th at p. 824; *Duarte*, *supra*, 232 Cal.App.4th at p. 384.)

### 4. *Equitable Defense of Laches*

The trial court addressed in its Order the defense of laches asserted by Wilcox. The court succinctly described her position as follows: "[Wilcox] has consistently relied

32

upon the equitable doctrine of laches as a defense to [CalSTRS's] claim that her compensation between November 2007, through June, 2008 was not creditable towards her retirement income under the Education Code due to the limited work she performed and the nature of that work. [Wilcox] claims that since she was not notified of [CalSTRS's] concern until 2016 and the actual administrative hearing was not until 2019, she was unable to produce adequate evidence as to the nature and volume of the work she performed about 10 years earlier."

The trial court acknowledged that Wilcox was "placed at great disadvantage" at the administrative hearing due to the many years that had elapsed since the time she had performed work after her resignation as Superintendent.[18] But the court held that "while [Wilcox] may have prejudiced by the delay, there is a strong public policy of protecting the integrity of a public retirement fund[,] and like the Petitioners in [*McGlynn v. State of California* (2018) 21 Cal.App.5th 548], she had no right to excess retirement benefits. While her employer may have promised otherwise and while she may have relied upon that promise, she cannot rely upon equitable doctrines such as laches to recover excess payments that contravene the requirements of the Education Code." The trial court therefore concluded that Wilcox could not assert the equitable doctrine of laches as a basis for challenging the conclusion that the SCCOE had misreported as creditable her compensation from November 2007 through June 2008. On appeal, Wilcox appears to challenge this conclusion.[19]

---

[18] The court stated: "[Wilcox] was placed at a great disadvantage attempting to recall and recreate the specifics of the work she performed in 2007-2008 when she appeared at the administrative hearing in 2019. Understandably, she could not recall with any detail what she did ten years earlier."

[19] The opening brief submitted by Wilcox contains (except for changing "petitioner" to "appellant") a verbatim discussion on the subject of laches that was presented in the trial court. Wilcox does not present any specific argument concerning the trial court's having committed error in rejecting her laches defense, nor does she (continued)

33

The United States Supreme Court has explained that "laches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation. [Citation.] Both before and after the merger of law and equity in 1938, this Court has cautioned against invoking laches to bar legal relief. [Citations.]" (*Petrella v. Metro-Goldwyn-Mayer, Inc.* (2014) 572 U.S. 663, 678, fn. omitted.) Therefore, "[t]he doctrine of laches applies in equitable actions alone. [Citations.]" (*Blue Cross of Northern California v. Cory* (1981) 120 Cal.App.3d 723, 743-744.)

The elements of the equitable defense of laches consist of "unreasonable delay in bringing suit 'plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay.' [Citation.] Prejudice is never presumed; rather it must be affirmatively demonstrated by the [proponent of the defense] in order to sustain his [or her] burdens of proof and the production of evidence on the issue. [Citation.]" (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 624.)

The trial court concluded that Wilcox could not assert laches as a defense to CalSTRS's claim that the SCCOE had misreported as creditable her compensation from November 2007 through June 30, 2008 because to do so would "contravene the requirements of the Education Code." This reasoning is grounded under case law considering the potential application of the defense of equitable estoppel against a governmental agency.

Although equitable estoppel may be asserted as a defense, in appropriate circumstances, to defeat action by a governmental entity " 'where justice and right require it' " (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 493), "no court has expressly invoked principles of estoppel to contravene directly any statutory or

address the cases (discussed *post*) relied upon by the court in reaching its decision. (See *In re Marriage of Shaban* (2001) 88 Cal.App.4th 398, 408.) ["[a]ppellate work is most assuredly not the recycling of trial level points and authorities"].)

constitutional limitations." (*Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 28.) Therefore, it was held in *Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864 that where the public agency misclassified employees as safety members (rather than general members) resulting in their retirement benefits being overstated, the employees were precluded from asserting that the agency was estopped from properly reclassifying them. The appellate court held: "[E]stoppel is barred where the government agency to be estopped does not possess the authority to do what it appeared to be doing. Here, [the agency] cannot be estopped from reclassifying [employees] as general members, because [it] did not possess the authority to continue to classify [employees] as safety members after they became district attorneys even though they appeared to be doing so. [Citations.]" (*Id.* at pp. 870-871.) In the same context of the miscalculation of pension benefits, several appellate courts have likewise held that the employee was precluded from asserting equitable estoppel where to do so would effectively compel the agency to violate the applicable pension laws. (See, e.g., *Blaser II*, *supra*, 86 Cal.App.5th at pp. 532-537; *McGlynn v. State of California* (2018) 21 Cal.App.5th 548, 561; *City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 542-543; *Fleice v. Chualar Union Elementary School Dist.* (1988) 206 Cal.App.3d 886, 893-895.)

By parity of reasoning, application of the equitable defense of laches here to ratify the improper reporting by the SCCOE of compensation as creditable and thereby require CalSTRS to pay miscalculated pension benefits to Wilcox would compel that agency to violate the Education Code. Under these circumstances, equity cannot be invoked to require the public agency, CalSTRS, to consider compensation received by Wilcox as creditable when to do so would contravene the Teachers' Retirement Law. (Cf. *Blaser II*, *supra*, 86 Cal.App.5th at pp. 536-537 ["applying estoppel here would *require* CalSTRS . . . to miscalculate Teachers' monthly retirement benefits to include credit for compensation that is *not* DB-creditable, in violation of the Education Code"].) This court recently had the occasion to determine the potential applicability of laches raised as a

35

defense by schoolteachers, members of CalSTRS, to claims by CalSTRS that the members had been overpaid due to their employer's misreporting of certain compensation as creditable. (See *Id.* at pp. 539-547.) We concluded that the members were precluded from asserting laches, inter alia, "because doing so would require CalSTRS to continue to calculate and pay benefits in a manner that 'directly contravene[s] statutory limitations.' [Citation.] A conclusion that laches barred CalSTRS from making benefit adjustments that are not time-barred would circumvent that principle that estoppel cannot apply to compel a governmental entity to act in a way that is contrary to its statutory authority. [Citation.]" (*Id.* at p. 547.)

Further, permitting the equitable defense of laches in this case would be antithetical to the policy that a public retirement board must administer its pension plan in a manner consistent with the law so that members receive only the benefits to which they are legally entitled. As the court in *Duarte* explained: "The constitutional obligations of a public retirement board such as the CalSTRS Board have been interpreted to include a duty 'to "ensure the rights of members and retirees to their full, *earned* benefits." ' [Citation.] Such obligations therefore do not permit the payment of benefits not otherwise authorized. [Citation.] Rather, 'the statutory scheme governs the scope of the benefits earned.' [Citation.] Thus, while ' "[p]ension provisions should be broadly construed in favor of those who were intended to be benefited thereby . . . [,] they cannot be construed so as to confer benefits on persons not entitled thereto." ' [Citation.]" (*Duarte*, *supra*, 232 Cal.App.4th at p. 385.)

The trial court did not err in its conclusion that Wilcox could not assert laches as a basis to prohibit CalSTRS from challenging the SCCOE's misreporting her compensation

received from November 2007 through June 30, 2008 as creditable.[20]

## IV.    DISPOSITION

The judgment on the petition for writ of mandate, entered on September 1, 2021, is affirmed.  Each party shall bear her/its own respective costs on appeal.

---

[20] There is an additional reason, not stated by the trial court, that Wilcox was precluded from asserting the equitable defense of laches.  The trial court, following this court's decision in *Baxter*, *supra*, 18 Cal.App.5th 340, held that (a) the statute of limitations barred CalSTRS's recovery of overpayments for benefits paid to Wilcox prior to October 10, 2015; and (b) under the continuous accrual theory, CalSTRS was not time-barred from asserting overpayment claims for benefits paid after October 10, 2015.  As we concluded in *Blaser II*, allowing the member to assert laches as a defense to preclude overpayment claims that were not barred by the statute of limitations would nullify the proper application of the continuous accrual theory.  Moreover, it would undermine that theory's policy goal of preventing the inequities that would arise "if the aggrieved party—the underpaid retiree or the plan administrator that overpaid benefits—were prohibited from seeking redress for claims arising out of periodic payments accruing within the limitations period."  (*Blaser II*, *supra*, 86 Cal.App.5th at p. 546.)  This principle would apply here to preclude Wilcox from asserting the equitable defense of laches.

37

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*Wilcox v. California State Teachers' Retirement System*
**H049809**